# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

South River Watershed Alliance, Inc.     *
                                         *
      Plaintiff,                        *
                                         *
v.                                       *
                                         *
City of Atlanta and                      *
Atlanta Police Foundation, Inc.          *
                                         *
      Defendants.                       *
_____     *

## Complaint for Injunctive Relief

## Nature of Action

1.     This is a Clean Water Act citizen suit for injunctive relief to

stop stormwater discharges that violate water quality standards.

## Jurisdiction

2.     This Court has jurisdiction under 28 U.S.C. § 1331 and 33

U.S.C. § 1365(a).

**Pre-Suit Notice**

3.      South River Watershed Alliance, Inc. provided notice that the City of Atlanta and Atlanta Police Foundation, Inc. were violating section 301(a) of the Clean Water Act because stormwater discharges from the Atlanta Training Facility construction site were not in compliance with the general permit, including Parts I.C.4., III.D.1, III.D.2, III.D.3, IV, and V.A.2. *(Notice letter at Exhibit 1, ECF 1-1).*

4.      The notice given to defendants was served over 60 days before suing and provided notice that South River Watershed Alliance would sue under the Clean Water Act's citizen suit provision if the violations were ongoing after 60 days. *33 U.S.C. §§ 1365(a)(1), 1365(b); 40 C.F.R. Part 135, Subpart A.*

**Venue**

5.      Venue is proper in the Northern District of Georgia because the source of the Clean Water Act violations is in this judicial district. 28 U.S.C. § 1391(b)(2) and 33 U.S.C. § 1365(c)(1).

## Parties

6.       South River Watershed Alliance, Inc. is a Georgia nonprofit corporation.

7.       South River Watershed Alliance is a "citizen" under the Clean Water Act's citizen suit provision. *33 U.S.C. §§ 1362(5), 1365(g).*

8.       South River Watershed Alliance is dedicated to protecting water quality in the South River watershed, including Intrenchment Creek and its watershed, through enforcement, advocacy, water quality testing, land and river cleanups, and environmental education.

9.       South River Watershed Alliance has members, including Margaret Spalding and Jacqueline Echols, Ph.D., who use Intrenchment Creek downstream of the Atlanta Training Facility and who use public lands within the Intrenchment Creek watershed to the east and south of the Atlanta Training Facility for aesthetic, scenic, and recreational values.

10.    Intrenchment Creek Park, across the stream from the Atlanta Training Facility, has been closed to the public since shortly after clearing started.

11.    South River Watershed Alliance has members who intend to continue using Intrenchment Creek Park for its proximity to Intrenchment Creek when the park is re-opened to the public, but these members are concerned that sediment from the Atlanta Training Facility construction site is degrading the water quality and aquatic habitat in Intrenchment Creek and lessening the aesthetic, scenic, and recreational values of this area.

12.    South River Watershed Alliance has members who use DeKalb County Parcel 15 051 01 002, which includes Intrenchment Creek from Constitution Road to the South River, adjacent wetlands, and riparian habitat. DeKalb County acquired Parcel 15 051 01 002 through the Georgia Land Conservation Program to permanently protect the land and waters in a natural state.

13.     Surface runoff from a portion of the Atlanta Training Facility construction site is conveyed into a culvert that discharges onto Parcel 15 051 01 002 west of Intrenchment Creek. Polluted stormwater from the Atlanta Training Facility construction site is discharged from this culvert into a stream and wetlands adjacent to the South River.

14.     Native wildlife on Parcel 15 051 01 002 includes beavers, otters, box turtles, amphibians, owls, blue herons, and other migratory birds that depend on Intrenchment Creek and wetlands for habitat and feeding.

15.     Sediment from the Atlanta Training Facility construction site is degrading the water quality and aquatic habitat on Parcel 15 051 01 002.

16.     Sediment from the Atlanta Training Facility construction site is lessening the aesthetic, scenic, and recreational values of Parcel 15 051 01 002 for South River Watershed Alliance's members who use this area.

17.     Stormwater discharged from the Atlanta Training Facility construction site harms South River Watershed Alliance's members by causing additional impairment to Intrenchment Creek's water quality and diminishing the habitat for aquatic species that remain after historic sediment pollution displaced other species.

18.     Stormwater discharged from the Atlanta Training Facility construction site harms South River Watershed Alliance's members by further delaying the time for Intrenchment Creek to be free from sediment that interferes with supporting aquatic life.

19.     South River Watershed Alliance sues on behalf of its members who are harmed by stormwater discharges from the Atlanta Training Facility.

20.     These harms would be redressed by injunctive relief prohibiting defendants from discharging stormwater that interferes with Intrenchment Creek's designated use.

21.     Defendant City of Atlanta authorized the Atlanta Training Facility to be constructed on property owned by the City.

22.     City of Atlanta employees are on the Atlanta Training Facility construction site each day.

23.     The City of Atlanta has the capacity to stop unlawful stormwater discharges from the Atlanta Training Facility construction site.

24.     The City of Atlanta is identified as the site owner on the notice of intent for coverage under the Clean Water Act general permit for stormwater discharges from construction sites *(General Permit No. GAR 100001)*.

25.     As a municipality, the City of Atlanta is a "person" subject to citizen suit enforcement under the Clean Water Act. *33 U.S.C. §§ 1362(5), 1365(a)(1)*.

26.     Defendant Atlanta Police Foundation, Inc. is a Georgia nonprofit corporation.

27.     Defendant Atlanta Police Foundation, Inc. entered a lease with the City of Atlanta to construct the Atlanta Training Facility.

28.     Atlanta Police Foundation, Inc. directs and exercises control over clearing, grading, construction activity, and stormwater discharges from the Atlanta Training Facility construction site.

29.     Atlanta Police Foundation, Inc. obtained permit coverage under a Clean Water Act general permit for stormwater discharges from construction sites. *(General Permit No. GAR 100001).*

30.     Alan Williams is identified as the "Operator" on the notice of intent for coverage *General Permit No. GAR 100001.*

31.     The City of Atlanta and Atlanta Police Foundation, Inc.

clarified that Alan Williams is an employee of Atlanta Police

Foundation, Inc., and that Atlanta Police Foundation, Inc. is the

operator of the project.

32.     The general permit defines operator as "the entity that has the

primary day-to-day operational control of those activities at the

construction site necessary to ensure compliance with Erosion,

Sedimentation and Pollution Control Plan requirements and permit

conditions."

33.     As a corporation, Atlanta Police Foundation, Inc. is a "person"

subject to citizen suit enforcement under the Clean Water Act. *33

U.S.C. §§ 1362(5), 1365(a)(1).*

## The Atlanta Training Facility Site

34.     A 2017 report by Atlanta's department of city planning, titled

"*The Atlanta City Design*," identified parts of southeast Atlanta and

southwest DeKalb County in the South River watershed as a

conservation corridor to be protected from new development. The

report called for creating South River Park, stating, "we're going to

invest in a 1,200+ acre southeastern reserve organized around the

tributaries of the South River." The report concluded this was "our

last chance for a massive urban park in the city" and identified "the

city-owned, 300+ acre former Atlanta Prison Farm" as the largest

tract to be protected.


35.     The Atlanta City Design report was adopted into the City of

Atlanta Charter in 2017. *Atlanta City Code, Part I, Sec. 3-601*.


36.     The city council later voted to authorize Atlanta Police

Foundation, Inc. to construct the Atlanta Training Facility on the Old

Atlanta Prison Farm site.

# Legal Background

## A.    *Clean Water Act Permit*

37.    The primary objective of the Clean Water Act is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *33 U.S.C. § 1251(a).*

38.    Section 301(a) of the Clean Water Act prohibits the discharge of any pollutant into waters of the United States from a point source except in compliance with a National Pollutant Discharge Elimination System ("NPDES") permit issued under section 402 of the Act. *33 U.S.C. §§ 1311(a), 1342(p), 1362(12); 40 C.F.R. §§ 122.1(b)(1), 122.2.*

39.    An NPDES permit is required to discharge stormwater from construction sites if there is at least one acre of clearing, grading, and excavating. *33 U.S.C. §§ 1311(a), 1342(p); 40 C.F.R. §§ 122.26(a)(9)(i), 122.26(b)(14)(x), 122.26(b)(15).*

40.     The State of Georgia was delegated authority to administer the Clean Water Act's permitting, compliance, and enforcement program.

41.     The Director of Georgia Environmental Protection Division ("EPD") issues NPDES permits for sites within the State. *O.C.G.A. § 12-5-30(a).*

42.     NPDES permits can authorize discharges from a specific facility (individual permits) or from multiple facilities within the same industry (general permits).

43.     The EPD Director issued a general permit for stormwater discharges from stand-alone construction projects that result in at least one acre of land disturbance. (*Authorization to Discharge Under the National Pollutant Discharge Elimination System, Storm Water Discharges Associated with Construction Activity for Stand Alone Construction Projects, General Permit No. GAR 100001*, *effective 8-1-18, reissued 6-20-23, effective 8-1-23*) ("the general permit").

44.     An entity that submits a notice of intent for coverage under the general permit is authorized to discharge stormwater from a construction site unless notified to the contrary by the EPD Director. *General Permit, Part I.D.2 (page 10).*

45.     The general permit requires compliance with a site-specific Erosion, Sedimentation, and Pollution Control Plan. *General Permit, Part II.B.1.g (p. 13); Part IV (p. 19).*

*46.*     The general permit requires compliance with best management practices for erosion control as specified in the Manual for Erosion and Sediment Control in Georgia. *General Permit, Part I.B.1 (p. 4), Part III.D.1 (p. 17), Part III.D.3 (p. 18), Part IV.D (p. 26).*

47.     Best management practices for erosion control required by the general permit include sediment basins to store sediment from land disturbance. *General Permit, Part IV.D.3.a.(3) (pp. 28-29), Manual, p. 6-10.*

48.     The general permit states: "Except as required to install the initial sediment storage requirements and perimeter control BMPs ..., the initial sediment storage requirements and perimeter control BMPs must be installed and implemented prior to conducting any other construction activities (e.g., clearing, grubbing and grading) within the construction site ..." *General Permit, Part III.D.2 (pp. 17-18).*

49.     The *Manual for Erosion and Sediment Control in Georgia* states that sediment storage "must be installed on the site PRIOR to any land-disturbing activities." *Manual at p. 6-1 (capitalization in original); See also Manual at pp. 4-5 and 6-10.*

50.     The failure to properly design, install, or maintain best management practices shall constitute a violation of the general permit for each day on which such failure occurs. *General Permit, Part III.D.3.*

51.     The site operator must notify EPD of known permit violations. *General Permit, Part V.A.2 (p. 38).*

**B.**     ***Water Quality Standards***

52.     To meet the Clean Water Act's goal of restoring and maintaining the chemical, physical, and biological integrity of the nation's waters, states must establish water quality standards that provide for the protection and propagation of aquatic life. *33 U.S.C.A. §§ 1251(a)(2), 1313.*

53.     Part I.C.4. of the general permit states: "No discharges authorized by this permit shall cause violations of Georgia's in-stream water quality standards as provided by the Rules and Regulations for Water Quality Control, Chapter 391-3-6-.03." *General Permit, Part I.C.4 (page 10).*

54.     Water quality standards include a designated use that must be protected for each water body and specify criteria necessary that protect the designated use. *33 U.S.C. § 1313(c)(2)(A); 40 C.F.R. §§ 131.10, 131.11.*

55.     Georgia's water quality standards include narrative criteria stating that all waters "shall be free from material related to … discharges which produce … objectionable conditions which interfere with the designated use of the water body." *Ga. Comp. R. & Regs. 391-3-6-.03(5), 391-3-6-.03(5)(c)*.

56.     Georgia's water quality standards include numeric criteria for turbidity that are deemed to be complied with on days when best management practices for erosion control are properly designed, installed, and maintained. *Ga. Comp. R. & Regs. 391-3-6-.03(5)(d)*.

57.     Georgia's narrative criteria prohibiting interference with the designated use of the water body is not subject to any such "BMP defense." *Ga. Comp. R. & Regs. 391-3-6-.03(5)(c)*.

58.     The Clean Water Act requires states to:

- identify surface waters that don't support their designated use ("impaired waters")

- identify any pollutant causing the impairment

- calculate the amount of that pollutant the waterbody can assimilate while supporting the designated use, and

- allocate the pollutant load capacity between point and nonpoint sources

59.     These pollutant load limits and allocations are established in a document called a Total Maximum Daily Load Evaluations ("TMDL Evaluations").

**Factual Background**

60.     Atlanta Police Foundation, Inc. submitted a notice of intent for coverage under the general permit to clear 86.9 acres for the Atlanta Training Facility. *Permittee NOI Number GAR189E51-V2.*

61.     Because over 50 acres would be cleared at once, the general permit requires extra capacity in the sediment storage basins. *General Permit, Part IV.D.3. (p. 27); Erosion Control Plan, Sheet EC-103.*

62.     The erosion control plan states, "No grading shall take place until … sediment ponds are constructed." *Initial Soil Erosion & Sedimentation Control Notes, Sheet EC-101, Note 14.*

63.     The Atlanta Training Facility construction site was cleared, and land disturbing activities took place throughout the site before the required sediment storage basins were completed.



64.     The required sediment storage basins have not been completed, including the temporary sediment basin from sheet 6 of the Erosion, Sedimentation, and Pollution Control Phase I Plan. *Sheet EC-206.*

65.     Stormwater from the Atlanta Training Facility is discharged into a perennial tributary that originates on the construction site and flows into Intrenchment Creek.

66.     The designated use for Intrenchment Creek is "Fishing, Propagation of Fish, Shellfish, Game and Other Aquatic Life." *Ga. Comp. R. & Regs. 391-3-6-.03(4)(c), 391-3-6-.03(14).*

67.     Intrenchment Creek doesn't meet water quality standards because sediment degrades habitat needed to support fish and macroinvertebrate populations. *EPD 2022 305(b) / 303(d) List.*

68.     In the TMDL Evaluations, EPD established two annual sediment limits for Intrenchment Creek — one for fish and one for benthic macroinvertebrates. *2007 Total Maximum Daily Load Evaluation for Seventy Stream Segments in the Ocmulgee River Basin for Sediment* ("2007 TMDL Evaluation") and *2017 TMDL Evaluation for Eleven Stream Segments in the Ocmulgee River Basin for Sediment* ("2017 TMDL Evaluation").

69.     Allowable pollutant loadings "are less than or equal to" the limits set in the TMDL Evaluations. *2007 TMDL Evaluation, p. 81 (PDF p. 89).*

70.     The annual sediment limit that EPD deemed necessary to support fish is 330.8 tons. *2007 TMDL Evaluation, p. 98 (PDF p. 106).*

71.     EPD determined that loading over 330.8 tons of sediment per year into Intrenchment Creek's watershed will "caus[e] additional impairment" to the stream. *2007 TMDL, p. 81 (PDF p. 89).*

72.     The annual sediment limit that EPD deemed necessary to support benthic macroinvertebrates is 945.3 tons. *2017 TMDL Evaluation, p. 58 (PDF p. 67).*

73.     EPD determined that loading over 945.3 tons of sediment per year into Intrenchment Creek's watershed will "caus[e] additional impairment" to the stream. *2017 TMDL, p. 51 (PDF p. 60).*

74.     EPD explained that as "sediment is carried into the stream, it settles to the stream bottom and smothers sensitive organisms." *2017 TMDL, p. 70 (PDF p. 79).*

75.     The 330.8-ton annual sediment limit for fish and the 945.3-ton annual sediment limit for macroinvertebrates are allocated between discharges from point sources ("wasteload allocation") and runoff from nonpoint sources (called "load allocation"). *2007 TMDL, Table 24 at p.* 98 *(PDF p. 106)*; *2017 TMDL, Table 26 at p. 58 (PDF p. 67)*; *40 C.F.R. §§ 130.2, 130.7.*

76.     The Atlanta Training Facility construction site discharges sediment from point sources – but EPD allotted the entire wasteload allocation to discharges from municipal separate storm sewer systems. *2007 TMDL, Table 24 at p.* 98 *(PDF p. 106)*; *2017 TMDL, Table 26 at p. 58 (PDF p. 67).*

77.    As shown in Table 24 from the 2007 TMDL Evaluation, the

330.8-ton annual sediment limit for fish is allocated between 99.3 tons

for nonpoint runoff ("load allocation") and 231.6 tons for point source

runoff ("wasteload allocation").

Total Maximum Daily Load Evaluation                                                    January 2007
Ocmulgee River Basin (Biota Impacted)

Table 24. Total Annual Sediment Loads and the Required Sediment Reduction

| Name | Current Load (tons/yr) | WLA (tons/yr) | WLAsw (tons/yr) | LA (tons/yr) | Allowable Total Load (tons/yr) | % Reduction |
|---|---|---|---|---|---|---|
| Barbershela Creek | 681.7 | | 180.0 | 77.2 | 257.1 | 62.3 |
| Big Sandy Creek | 155.4 | | | 155.4 | 155.4 | 0.0 |
| Brown Branch | 430.1 | | | 189.3 | 189.3 | 56.0 |
| Butlers Creek | 59.7 | | | 59.7 | 59.7 | 0.0 |
| Cabin Creek | 982.4 | 257.2 | | 223.1 | 480.3 | 51.1 |
| Calaparchee Creek | 208.5 | | | 153.5 | 153.5 | 26.4 |
| Carr Branch | 58.1 | | 10.2 | 47.9 | 58.1 | 0.0 |
| Cobbs Creek | 257.9 | | 82.8 | 35.5 | 118.3 | 54.1 |
| Cole Creek | 122.5 | | | 56.3 | 56.3 | 54.0 |
| Doolittle Creek | 712.9 | | 191.4 | 82.0 | 273.4 | 61.6 |
| Dried Indian Creek | 367.5 | | 126.5 | 121.0 | 247.6 | 32.6 |
| Eightmile Creek | 86.0 | | | 34.9 | 34.9 | 59.4 |
| Garner Creek | 389.0 | | 142.5 | 61.1 | 203.6 | 47.7 |
| Gladesville Creek | 181.7 | | | 181.7 | 181.7 | 0.0 |
| Hansford Branch | 26.1 | | | 26.1 | 26.1 | 0.0 |
| Harmon Pye Branch | 88.4 | | | 88.4 | 88.4 | 0.0 |
| Herds Creek | 487.8 | | | 487.8 | 487.8 | 0.0 |
| Intrenchment Creek | 330.8 | | 231.6 | 99.3 | 330.8 | 0.0 |

78.     As shown in Table 26 from the 2017 TMDL Evaluation, the 945.3-ton annual sediment limit for macroinvertebrates is allocated between 365.9 tons for nonpoint runoff ("load allocation") and 579.3 tons for point source runoff ("wasteload allocation").

Total Maximum Daily Load Evaluation                                                    April 2017
Ocmulgee River Basin (Biota Impacted)

**Table 26. Total Allowable Sediment Loads and the Required Sediment Load Reductions**

| Stream Segment | Station ID | WLA (tons/yr) | WLA$_{sw}$ (tons/yr) | LA (tons/yr) | Current Total Load (tons/yr) | Total Allowable Sediment Load (tons/yr) | Maximum Allowable Daily Load (tons/day) | % Reduction |
|---|---|---|---|---|---|---|---|---|
| Not Supporting Segments - Fish Community | | | | | | | | |
| Caney Fork Creek | WRD 1193 | - | 338.9 | 569.4 | 1079.4 | 908.2 | 117.7 | 15.9% |
| Peeksville Creek | WRD 50 | - | 117.1 | 1775.1 | 3600.7 | 1892.2 | 245.2 | 47.4% |
| Swan Creek | WRD 68 | - | - | 2381.3 | 2381.3 | 2381.3 | 308.6 | 0% |
| Tributary to Tussahaw Creek | WRD 40 | - | 53.6 | 1183.4 | 1237.0 | 1237.0 | 160.3 | 0% |
| Tussahaw Creek | WRD 54 | 5.5 | 3023.5 | 33747.7 | 44583.4 | 36776.7 | 4766.3 | 17.5% |
| Wolf Creek | WRD 1127 | - | 757.2 | 1109.3 | 1866.6 | 1866.6 | 241.9 | 0% |
| Not Supporting Segments - Macroinvertebrate Community | | | | | | | | |
| Intrenchment Creek | EPD 45b-212 | - | 579.3 | 365.9 | 945.3 | 945.3 | 122.5 | 0% |
| Pughs Creek | EPD 45b-193 | - | 1427.9 | 1292.2 | 2857.9 | 2720.1 | 352.5 | 4.8% |
| Snapfinger Creek | EPD 45b-201 | - | 2347.6 | 2025.9 | 4373.6 | 4373.6 | 566.8 | 0% |
| South River | EPD 45b-213 | - | 3088.1 | 2436.0 | 5524.2 | 5524.2 | 715.9 | 0% |
| Tributary to Gum Branch | EPD 65c-38 | - | 100.7 | 470.1 | 657.4 | 570.8 | 15.1 | 13.2% |

Definitions:

**Current Total Load** – Sum of modeled sediment load and approved waste load allocations (WLA)
**WLA** - waste load allocation for discrete point sources
**WLA$_{sw}$** - waste load allocation associated with storm water discharges from a municipal separate storm sewer system (MS4)
**LA** - portion of the total allowable sediment load attributed to nonpoint sources and natural background sources of sediment
**Total Allowable Sediment Load** - allowable sediment load calculated using the target sediment yield and the stream's watershed area
**Maximum Allowable Daily Load** - total allowable sediment load (annual) converted to a daily figure based on the bankfull sediment transport relationship
**% Reduction** - percent reduction applied to current load in order to meet total allowable sediment load

79.    The 231.6-ton wasteload allocation for fish (2007) and the

579.3-ton wasteload allocation for macroinvertebrates (2017) are

allocated to "WLAsw."

80.    The TMDL defines WLAsw as "waste load allocation

associated with storm water discharges from a municipal separate

storm sewer system (MS4)."

81.    Sediment discharged from the Atlanta Training Facility

construction site into Intrenchment Creek is not covered under MS4

permits issued to the City of Atlanta or DeKalb County.

82.    When EPD established the annual sediment limits, it stated that

for future construction sites discharging stormwater into impaired

waters, compliance with the general permit is "effective

implementation" of the wasteload allocation. *2017 TMDL, p. 52 (PDF

p. 61).*

83.     According to EPD, "The conditions of the [general] permit were established to assure that the storm water runoff from these sites **does not cause or contribute sediment to the stream**." *2007 TMDL, p. 83 (PDF p. 91) (emphasis added)*.

84.     Atlanta Police Foundation, Inc. similarly claimed that "by following the guidelines established in the NPDES permit, the development and construction of the Project **will not cause or contribute sediment to Intrenchment Creek**." *(emphasis added)*.

85.     Stormwater from the Atlanta Training Facility construction site conveys eroded sediment into Intrenchment Creek when it rains:



86.     No other land disturbing activity is discharging sediment into the perennial tributary that originates on the Atlanta Training Facility site.

87.     The perennial tributary didn't convey visibly polluted water into Intrenchment Creek before the site was cleared for the Atlanta Training Facility.

88.     The site was mostly forested before being cleared for the Atlanta Training Facility.







89.     Atlanta Police Foundation, Inc. claimed "there is sediment load capacity available within the Intrenchment Creek watershed," but no pollutant load allocations remain from the 330-ton and 945-ton annual sediment limits. *2007 TMDL, Table 24 at p. 98 (PDF p. 106); 2017 TMDL, Table 26 at p. 58 (PDF p. 67).*

90.     Sediment loading into Intrenchment Creek already exceeded the annual limits before clearing the Atlanta Training Facility site. *USGS Scientific Investigations Report, 2021, Hydrology and Water Quality in 15 Watersheds in DeKalb County, Georgia, 2012–16, pp. 7, 74-75.*

91.     Increased suspended sediment and sedimentation has detrimental effects on fish and macroinvertebrates, including avoidance of sedimented areas, reduced physiological function, reproductive impairment, and mortality.

92.     Land clearing at the training center construction site has increased the sediment load in Intrenchment Creek.

93.     Stormwater discharges from the Atlanta Training Facility construction site are causing additional impairment to the stream's capacity to support fish and macroinvertebrates.

94.     Stormwater discharges from the Atlanta Training Facility construction site are degrading the habitat for aquatic species in Intrenchment Creek downstream of the perennial tributary.

95.     Stormwater discharges from the Atlanta Training Facility construction site are delaying the time for Intrenchment Creek to be free from sediment that interferes with the stream's capacity to support aquatic life.

96.     Creating impervious surfaces where there used to be vegetated land cover will cause further interference with Intrenchment Creek's capacity to support fish and macroinvertebrates.

## Count 1 – Clean Water Act Violations

97.     Section 505 of the Clean Water Act authorizes citizen suits against any person, including a municipality or corporation, who is alleged to be in violation of section 301(a) of the Act or alleged to be in violation of a permit or permit condition issued under section 402 of the Act. *33 U.S.C. §§ 1362(5), 1365(a)(1), 1365(f)(1), 1365(f)(7).*

98.     Stormwater discharges from the Atlanta Training Facility construction site are causing violations of Georgia's water quality standards by interfering with Intrenchment Creek's capacity to support aquatic life.

99.     The City of Atlanta and Atlanta Police Foundation, Inc. are in violation of Section 301(a) of the Clean Water Act and Part I.C.4 of the general permit by discharging stormwater that causes impairment to Intrenchment Creek and interferes with its designated use.

100.    The City of Atlanta and Atlanta Police Foundation, Inc. are in

violation of Section 301(a) of the Clean Water Act and the general

permit by undertaking land-disturbing activities, including clearing,

grubbing, and grading, before completing the required sediment

storage ponds. *General Permit, Part III.D.2 (pp. 17-18), Part III.D.3 (p.*

*18), Part IV (p. 19), Part IV.D.3.a.3 (pp. 28-29); Manual, pp. 6-1, 6-10;*

*Erosion Control Plan, Sheet EC-101, Note 14 and Sheet EC-103.*


101.    Atlanta Police Foundation, Inc. are in violation of Section

301(a) of the Clean Water Act and the general permit by failing to

document known permit violations and failing to submit a summary of

violations to EPD within 14 days. *General Permit, Part V.A.2 (p. 38).*


## Requested Relief

Plaintiff respectfully requests:

a.      A judgment finding that defendants violated and are in violation

of section 301(a) of the Clean Water Act and Parts I.C.4.,

III.D.1, III.D.2, III.D.3, IV, and V.A.2 of the general permit.

b.      Injunctive relief requiring defendants to stop the discharge of

sediment caused by construction activity at the Atlanta Training

Facility construction site until Intrenchment Creek has capacity

to assimilate the sediment without interfering with the stream's

designated use.


c.      Such other relief to which plaintiff may be entitled at equity as is

just and appropriate, or at law including under 33 U.S.C.

§ 1365(d).


Filed August 1, 2023.


/s/ Jon Schwartz

Jon Schwartz
Ga. Bar. No. 631038
*Attorney for Plaintiff South River Watershed Alliance, Inc.*

**Law Office of Jon Schwartz**
1100 Peachtree St., N.E., Suite 250
Atlanta, GA 30309
404-667-3047
jon@jonschwartz.net