## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

South River Watershed Alliance, Inc.    *
                              *

       Plaintiff,                 *
                              *

v.                                      *    1:23-cv-03416-JPB
                              *

City of Atlanta and              *
Atlanta Police Foundation, Inc.     *
                              *

       Defendants.            *
_____ *

## Amended Complaint for Injunctive Relief

### Nature of Action

1.      This is a Clean Water Act citizen suit for injunctive relief to stop stormwater discharges that violate water quality standards.

### Jurisdiction

2.      This Court has jurisdiction under 28 U.S.C. § 1331 and 33 U.S.C. § 1365(a).

## Pre-Suit Notice

3.    South River Watershed Alliance, Inc. provided notice that the City of Atlanta and Atlanta Police Foundation, Inc. were violating section 301(a) of the Clean Water Act because stormwater discharges from the Atlanta Training Facility construction site were not in compliance with the general permit, including Part I.C.4. *(Exhibit 1)*.

4.    The notice given to defendants was served over 60 days before suing and provided notice that South River Watershed Alliance would sue under the Clean Water Act's citizen suit provision if the violations were ongoing after 60 days. *33 U.S.C. §§ 1365(a)(1), 1365(b); 40 C.F.R. Part 135, Subpart A.*

## Venue

5.    Venue is proper in the Northern District of Georgia because the source of the Clean Water Act violations is in this judicial district. 28 U.S.C. § 1391(b)(2) and 33 U.S.C. § 1365(c)(1).

## Parties

6.    South River Watershed Alliance, Inc. is a Georgia nonprofit corporation.

7.     South River Watershed Alliance is a "citizen" under the Clean Water Act's citizen suit provision. *33 U.S.C. §§ 1362(5), 1365(g).*

8.     South River Watershed Alliance is dedicated to protecting water quality in the South River watershed, including Intrenchment Creek and its watershed, through enforcement, advocacy, water quality testing, land and river cleanups, and environmental education.

9.     South River Watershed Alliance has members, including Margaret Spalding and Jacqueline Echols, Ph.D., who use Intrenchment Creek downstream of the Atlanta Training Facility and who use public lands within the Intrenchment Creek watershed to the east and south of the Atlanta Training Facility for aesthetic, scenic, and recreational values.

10.     Intrenchment Creek Park, across the stream from the Atlanta Training Facility, has been closed to the public since shortly after clearing started.

11.     South River Watershed Alliance has members who intend to
continue using Intrenchment Creek Park for its proximity to
Intrenchment Creek when the park is re-opened to the public, but
sediment from the Atlanta Training Facility construction site is
degrading the water quality and aquatic habitat in Intrenchment Creek
and lessening the aesthetic, scenic, and recreational values of this area.

12.     South River Watershed Alliance has members who use DeKalb
County Parcel 15 051 01 002, which includes Intrenchment Creek
from Constitution Road to the South River, adjacent wetlands, and
riparian habitat. DeKalb County acquired Parcel 15 051 01 002
through the Georgia Land Conservation Program to permanently
protect the land and waters in a natural state.

13.     Native wildlife on Parcel 15 051 01 002 includes beavers, otters,
box turtles, amphibians, owls, blue herons, and other migratory birds
that depend on Intrenchment Creek and wetlands for habitat and
feeding.

14.     Sediment from the Atlanta Training Facility construction site is degrading the water quality and aquatic habitat of Intrenchment Creek on Parcel 15 051 01 002.

15.     Sediment in Intrenchment Creek from the Atlanta Training Facility construction site is lessening the aesthetic, scenic, and recreational values of Parcel 15 051 01 002 for South River Watershed Alliance's members who use this area.

16.     Stormwater discharged from the Atlanta Training Facility construction site harms South River Watershed Alliance's members by causing additional impairment to Intrenchment Creek's water quality and diminishing the habitat for aquatic species that remain after historic sediment pollution displaced other species.

17.     Stormwater discharged from the Atlanta Training Facility construction site harms South River Watershed Alliance's members by further delaying the time for Intrenchment Creek to be free from sediment that interferes with supporting aquatic life.

18.     South River Watershed Alliance sues on behalf of its members who are harmed by stormwater discharges from the Atlanta Training Facility.

19.     These harms would be redressed by injunctive relief prohibiting defendants from discharging stormwater that interferes with Intrenchment Creek's designated use.

20.     Defendant City of Atlanta authorized the Atlanta Training Facility to be constructed on property owned by the City.

21.     City of Atlanta employees are on the Atlanta Training Facility construction site each day.

22.     The City of Atlanta has the capacity to stop unlawful stormwater discharges from the Atlanta Training Facility construction site.

23.     The City of Atlanta is identified as the site owner on the notice of intent for coverage under the Clean Water Act general permit for stormwater discharges from construction sites *(General Permit No. GAR 100001).*

24.     As a municipality, the City of Atlanta is a "person" subject to citizen suit enforcement under the Clean Water Act. *33 U.S.C. §§ 1362(5), 1365(a)(1).*

25.     Defendant Atlanta Police Foundation, Inc. is a Georgia nonprofit corporation.

26.     Defendant Atlanta Police Foundation, Inc. entered a lease with the City of Atlanta to construct the Atlanta Training Facility.

27.     Atlanta Police Foundation, Inc. directs and exercises control over clearing, grading, construction activity, and stormwater discharges from the Atlanta Training Facility construction site.

28.     Atlanta Police Foundation, Inc. obtained permit coverage under a Clean Water Act general permit for stormwater discharges from construction sites. *(General Permit No. GAR 100001).*

29.     Alan Williams is identified as the "Operator" on the notice of intent for coverage *General Permit No. GAR 100001.*

30.     The City of Atlanta and Atlanta Police Foundation, Inc. clarified that Alan Williams is an employee of Atlanta Police Foundation, Inc., and that Atlanta Police Foundation, Inc. is the operator of the project.

31.     The general permit defines operator as "the entity that has the primary day-to-day operational control of those activities at the construction site necessary to ensure compliance with Erosion, Sedimentation and Pollution Control Plan requirements and permit conditions."

32.    As a corporation, Atlanta Police Foundation, Inc. is a "person" subject to citizen suit enforcement under the Clean Water Act. *33 U.S.C. §§ 1362(5), 1365(a)(1).*

## The Atlanta Training Facility Site

33.    A 2017 report by Atlanta's department of city planning, titled "*The Atlanta City Design*," identified parts of southeast Atlanta and southwest DeKalb County in the South River watershed as a conservation corridor to be protected from new development. The report called for creating South River Park, stating, "we're going to invest in a 1,200+ acre southeastern reserve organized around the tributaries of the South River." The report concluded this was "our last chance for a massive urban park in the city" and identified "the city-owned, 300+ acre former Atlanta Prison Farm" as the largest tract to be protected.

34.    The Atlanta City Design report was adopted into the City of Atlanta Charter in 2017. *Atlanta City Code, Part I, Sec. 3-601.*

35.     The city council later voted to authorize Atlanta Police Foundation, Inc. to construct the Atlanta Training Facility on the Old Atlanta Prison Farm site.

## Legal Background

### A.     Water Quality Standards

36.     The primary objective of the Clean Water Act is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *33 U.S.C. § 1251(a).*

37.     To meet this objective, states must establish "water quality standards" that provide for the protection and propagation of aquatic life and that that support recreation in and on the water. 33 U.S.C. §§ 1251(a)(2), § 1313(c)(2)(A); 40 C.F.R. § 130.3.

38.     Water quality standards include a designated use for each water body and specify numeric and narrative water quality criteria to protect the designated use. *33 U.S.C. § 1313(c)(2)(A); 40 C.F.R. §§ 130.3, 131.10, 131.11.*

39.     The designated use for each water body in Georgia requires

water quality that fully protects native aquatic life.


40.     The U.S. Environmental Protection Agency ("EPA")

instructed that water quality must protect all native species:

> Species that are in the water body and which are
> consistent with the designated use (i.e., not aberrational)
> must be protected, even if not prevalent in number or
> importance. Nor can activity be allowed which would
> render the species unfit for maintaining the use. Water
> quality should be such that it results in no mortality and
> no significant growth or reproductive impairment of
> resident species. *EPA, Questions and Answers on
> Antidegradation 8 (Aug. 1985).*

41.     Georgia's water quality standards include narrative criteria

stating that all waters "shall be free from material related to …

discharges which produce … objectionable conditions which interfere

with the designated use of the water body." *Ga. Comp. R. & Regs. 391-

3-6-.03(5)(c).*

42.     The Georgia Board of Natural Resources adopted a prior version of this narrative criteria that included the word "unreasonably" immediately before the word "interfere," i.e., prohibiting activities which "*unreasonably* interfere with the designated use of the water body." (emphasis added).

43.     EPA reviews and approves or rejects State-adopted water quality standards. 40 C.F.R. § 131.5.

44.     EPA rejected the phrase "unreasonably interfere with the designated use of the water body."

45.     After Georgia deleted the word "unreasonably," EPA determined the language was consistent with the Clean Water Act and 40 C.F.R. Part 131 and therefore approved the narrative criteria at Rule 391-3-6-.03(5)(c).

46.    Georgia's water quality standards include numeric and
narrative criteria for turbidity at subsection 5(d). These criteria are
deemed to be complied with on days when best management practices
for erosion control are properly designed, installed, and maintained.
*Ga. Comp. R. & Regs. 391-3-6-.03(5)(d).*


47.    Georgia's narrative criteria in subsection 5(c) – prohibiting
interference with the water body's designated use – is not subject to
any such "BMP defense." *Ga. Comp. R. & Regs. 391-3-6-.03(5)(c).*


48.    The Clean Water Act requires states to:

- identify surface waters where water quality doesn't
  support the designated use ("impaired waters")

- calculate how much of the pollutant causing the
  impairment can enter the waterbody without violating
  water quality standards ("assimilative capacity") and

- allocate that pollutant load capacity between point
  sources and nonpoint sources

33 U.S.C. §§ 1313(d)(1)(A), 1313(d)(1)(C); 40 C.F.R. §§ 130.2, 130.7.

49.    EPD establishes these pollutant limits and load allocations in documents called *Total Maximum Daily Load Evaluations* ("TMDL Evaluations").

50.    "Biota-impaired streams" are streams where sedimentation has degraded habitat for aquatic life so the stream doesn't fully support its designated use.

51.    EPD sets an annual "total allowable sediment load" for biota-impaired streams.

52.    The total allowable sediment load is EPD's calculation of the maximum amount of sediment "that can be assimilated" by the stream "without causing additional impairment to the stream" and "without exceeding the applicable water quality criteria; in this case, the narrative water quality criteria for aquatic life." 2007 TMDL Evaluation for Seventy Stream Segments in the Ocmulgee River Basin for Sediment; 2017 TMDL Evaluation for Eleven Stream Segments in the Ocmulgee River Basin for Sediment.

**B.     Clean Water Act Permit**

53.     Section 301(a) of the Clean Water Act prohibits the discharge of any pollutant into waters of the United States from a point source except in compliance with a National Pollutant Discharge Elimination System ("NPDES") permit issued under section 402 of the Act. *33 U.S.C. §§ 1311(a), 1342(p), 1362(12); 40 C.F.R. §§ 122.1(b)(1), 122.2.*

54.     An NPDES permit is required to discharge stormwater from construction sites if there is at least one acre of clearing, grading, and excavating. *33 U.S.C. §§ 1311(a), 1342(p); 40 C.F.R. §§ 122.26(a)(9)(i), 122.26(b)(14)(x), 122.26(b)(15).*

55.     The State of Georgia was delegated authority to administer the Clean Water Act's permit program.

56.     NPDES permits can authorize discharges from a specific facility (individual permits) or from multiple facilities within the same industry (general permits).

57.     The EPD Director issued a general permit for stormwater discharges from stand-alone construction projects that result in at least one acre of land disturbance. (*Authorization to Discharge Under the National Pollutant Discharge Elimination System, Storm Water Discharges Associated with Construction Activity for Stand Alone Construction Projects, General Permit No. GAR 100001*, *effective August 1, 2018*) ("the general permit").

58.     An entity that submits a notice of intent for coverage is authorized to discharge stormwater from a construction site under the terms and conditions of the general permit unless notified to the contrary by the EPD Director. *General Permit, Part I.D.2 (page 10).*

59.     Part I.C.4. of the general permit states: "No discharges authorized by this permit shall cause violations of Georgia's in-stream water quality standards as provided by the Rules and Regulations for Water Quality Control, Chapter 391-3-6-.03." *General Permit, Part I.C.4 (page 10).*

## Factual Background

60.    Atlanta Police Foundation, Inc. submitted a notice of intent for coverage under the general permit to clear 86.9 acres for the Atlanta Training Facility. *Permittee NOI Number GAR189E51-V2.*

61.    Stormwater from the Atlanta Training Facility is discharged into a perennial tributary that originates on the site and flows into Intrenchment Creek.

62.    The designated use for Intrenchment Creek is "Fishing, Propagation of Fish, Shellfish, Game and Other Aquatic Life." *Ga. Comp. R. & Regs. 391-3-6-.03(4)(c), 391-3-6-.03(14).*

63.    The Atlanta Training Center construction site discharges sediment that interferes with Intrenchment Creek's designated use.

64.    Intrenchment Creek is biota-impaired.

65.    EPD established two annual sediment limits for Intrenchment

Creek — one for fish and one for benthic macroinvertebrates.


66.    The annual sediment limit EPD found necessary to support fish

is 330.8 tons. *2007 TMDL, p. 106.*


67.    EPD determined that loading over 330.8 tons of sediment per

year into Intrenchment Creek's watershed will "caus[e] additional

impairment" to the stream. *2007 TMDL, p. 89.*


68.    The annual sediment limit EPD found necessary to support

benthic macroinvertebrates is 945.3 tons. *2017 TMDL, p. 67.*


69.    EPD determined that loading over 945.3 tons of sediment per

year into Intrenchment Creek's watershed will "caus[e] additional

impairment" to the stream. *2017 TMDL, p. 60.*


70.    EPD explained that as "sediment is carried into the stream, it

settles to the stream bottom and smothers sensitive organisms."

71.     The total allowable sediment loads reflect EPD's judgment on Intrenchment Creek's assimilative capacity to support aquatic life.

72.     The 330.8-ton annual sediment limit for fish and the 945.3-ton annual sediment limit for macroinvertebrates are allocated between discharges from point sources ("wasteload allocation") and runoff from nonpoint sources (called "load allocation"). *2007 TMDL, Table 24 at p. 106*; *2017 TMDL, Table 26 at p. 67*; *40 C.F.R. §§ 130.2, 130.7.*

73.     The 330.8-ton annual sediment limit for fish in the 2007 TMDL is allocated between 231.6 tons from point source discharges and 99.3 tons from nonpoint source erosion:

Total Maximum Daily Load Evaluation                                        January 2007
Ocmulgee River Basin (Biota Impacted)

**Table 24. Total Annual Sediment Loads and the Required Sediment Reduction**

| Name | Current Load (tons/yr) | WLA (tons/yr) | WLAsw (tons/yr) | LA (tons/yr) | Allowable Total Load (tons/yr) | % Reduction |
|------|----------|----------|----------|----------|----------|----------|
| Intrenchment Creek | 330.8 | | 231.6 | 99.3 | 330.8 | 0.0 |

*Excerpt from Table 24, 2007 TMDL, p. 106.*

74.     The 945.3-ton annual sediment limit for macroinvertebrates in

the 2017 TMDL is allocated between 579.3 tons from point source

discharges and 365.9 tons from nonpoint source erosion:

**Table 26. Total Allowable Sediment Loads and the Required Sediment Load Reductions**

| Stream Segment | Station ID | WLA (tons/yr) | WLA$_{sw}$ (tons/yr) | LA (tons/yr) | Current Total Load (tons/yr) | Total Allowable Sediment Load (tons/yr) | Maximum Allowable Daily Load (tons/day) | % Reduction |
|---|---|---|---|---|---|---|---|---|
| Intrenchment Creek | EPD 45b-212 | - | 579.3 | 365.9 | 945.3 | 945.3 | 122.5 | 0% |

Definitions:

**Current Total Load** - Sum of modeled sediment load and approved waste load allocations (WLA)
**WLA** - waste load allocation for discrete point sources
**WLA$_{sw}$** - waste load allocation associated with storm water discharges from a municipal separate storm sewer system (MS4)
**LA** - portion of the total allowable sediment load attributed to nonpoint sources and natural background sources of sediment
**Total Allowable Sediment Load** - allowable sediment load calculated using the target sediment yield and the stream's watershed area
**Maximum Allowable Daily Load** - total allowable sediment load (annual) converted to a daily figure based on the bankfull sediment transport relationship
**% Reduction** - percent reduction applied to current load in order to meet total allowable sediment load

*(Excerpt from Table 26, 2017 TMDL, p. 67).*

75.     The 231.6-ton wasteload allocation for fish (2007) and the

579.3-ton wasteload allocation for macroinvertebrates (2017) are

allocated to "WLAsw," which is defined as "waste load allocation

associated with storm water discharges from a municipal separate

storm sewer system (MS4)."

76.     An MS4 is a system of drains, pipes, and other structures

owned by a local government that collects stormwater for conveyance

into surface waters.


77.     The wasteload allocations for municipal storm systems are

distinct from wasteload allocations for stormwater discharges from

construction sites. *See, 33 U.S.C. § 1342(p)(3)(B) (permit for discharges*

*from municipal storm sewers) and 33 U.S.C. § 1342(p)(3)(A) (permit for*

*discharges associated with industrial activity, which includes stormwater*

*from construction sites with at least one acre of clearing).*


78.     The Atlanta Training Center construction site discharges

sediment from point sources, but the wasteload allocation for

Intrenchment Creek was allocated to other point sources – specifically

the municipal separate storm sewer systems. *2007 TMDL, Table 24 at*

*p. 106*; *2017 TMDL, Table 26 at p. 67.*

79.     Sediment discharged from the Atlanta Training Facility construction site into Intrenchment Creek is not covered under MS4 permits issued to the City of Atlanta or DeKalb County.

80.     When EPD established the total allowable sediment loads, it stated that for future construction sites discharging stormwater into impaired waters, compliance with the general permit is "effective implementation" of the wasteload allocation. *2017 TMDL, p. 52 (PDF p. 61).*

81.     According to EPD, "The conditions of the [general] permit were established to assure that the storm water runoff from these sites **does not cause or contribute sediment to the stream**." *2007 TMDL, p. 83 (PDF p. 91) (emphasis added).*

82.     After South River Watershed Alliance sent its pre-suit notice letter, EPD's Watershed Protection Branch chief wrote that EPD allows coverage under the general permit for construction sites discharging into biota-impaired streams with no remaining wasteload

allocation because clearing, grading, and excavating won't increase the amount of sediment entering the receiving stream.

83.     EPD claims sediment from future construction sites is accounted for in the total allowable sediment load because compliance with best management practices for erosion control – as required by the general permit – will supposedly maintain the sediment loading into receiving waters at the same amount as nonpoint runoff from an undisturbed site.

84.     Specifically, EPD claims that "[s]tormwater discharges are accounted for in TMDLs as nonpoint source load allocations" and that "sediment discharges from stormwater runoff at pre-construction levels are expected and accounted for in the LA [load allocation] portion of a TMDL."

85.     EPD used the Universal Soil Loss Equation to calculate load allocations (sediment from nonpoint sources) in the TMDL Evaluations. *(2007 TMDL, p. 82; 2017 TMDL, p. 55)*.

86.     EPD's claim that pre-development sediment loading rates won't increase if construction activities comply with best management practices for erosion control ("BMPs") is refuted by those Universal Soil Loss Equation calculations and by data on the effectiveness of BMPs.

87.     Using the Universal Soil Loss Equation for Intrenchment Creek's watershed, EPD calculated the total allowable sediment load to protect fish as 0.05 tons per acre per year. *(2007 TMDL, p. 95)*.

88.     Using the Universal Soil Loss Equation for Intrenchment Creek's watershed, EPD calculated the total allowable sediment load to protect macroinvertebrates as 0.14 tons per acre per year. *(2017 TMDL, p. 63)*.

89.    For fish, 30 percent of the total allowable sediment load was allocated to the nonpoint "load allocation" and the remaining 70 percent was allocated to the municipal separate storm sewer systems (MS4). *(2007 TMDL, p. 106).*

90.    For macroinvertebrates, 38.7 percent of the total allowable sediment load was allocated to the nonpoint "load allocation" and the remaining 61.3 percent was allocated to the municipal separate storm sewer systems (MS4). *(2017 TMDL, Exh. G, p. 67).*

91.    This means the nonpoint source load allocation EPD found necessary for Intrenchment Creek to attain water quality protective of fish is less than 0.05 tons of sediment per acre per year, and the nonpoint source load allocation EPD found necessary for Intrenchment Creek to attain water quality protective of macroinvertebrates is less than 0.14 tons of sediment per acre per year.

92.     According to EPD, construction sites will meet these limits by properly designing, installing, and maintaining best management practices for erosion control as required by the general permit.

93.     Atlanta Police Foundation, Inc. similarly claimed that "by following the guidelines established in the NPDES permit, the development and construction of the Project **will not cause or contribute sediment to Intrenchment Creek**." *(emphasis added).*

94.     Stormwater from the Atlanta Training Facility construction site conveys eroded sediment into Intrenchment Creek when it rains:



95.     No other land disturbing activity is discharging sediment into the perennial tributary that originates on the Atlanta Training Facility site.

96.     The site was mostly forested before being cleared for the Atlanta Training Facility.







97.     The perennial tributary didn't convey visibly polluted water into Intrenchment Creek before the site was cleared for the Atlanta Training Facility.

98.     Land clearing at the training center construction site has increased turbidity and sediment in Intrenchment Creek.

99.     Increased turbidity and sediment in Intrenchment Creek harms native species.

100.    When a stream's velocity decreases, sediment falls out of the water column.

101.    In watersheds with more impervious surface, such as Intrenchment Creek, stormwater runoff reaches the stream faster which causes the stream's velocity to increase and decrease faster during storms compared to less disturbed watersheds.

102. When a stream's velocity decreases quickly, an increased volume of sediment falls out of the water column, especially sands and silts.

103. When Intrenchment Creek's velocity decreases, sediment from the Atlanta Training Facility construction site falls out of the water column and adds to sedimentation on the stream channel.

104. At least several tons of sediment from the Atlanta Training Facility construction site will be deposited on the bottom of Intrenchment Creek if construction continues.

105. Stormwater discharges from the Atlanta Training Facility construction site interfere with Intrenchment Creek's designated use.

106. Stormwater discharges from the Atlanta Training Facility construction site exceed the limits EPD found necessary for Intrenchment Creek to meet water quality standards.

107.    Increased suspended sediment and sedimentation from the Atlanta Training Facility construction site interfere with Intrenchment Creek's designated use by degrading habitat for aquatic species.

108.    Increased suspended sediment and sedimentation from the Atlanta Training Facility construction site interfere with Intrenchment Creek's designated use by causing mortality, reproductive impairment, and growth impairment of native macroinvertebrates and fish.

109.    Increased suspended sediment and sedimentation from the Atlanta Training Facility construction site interfere with Intrenchment Creek's designated use by causing serious and irreversible harm to native fish and macroinvertebrates already stressed by sediment loads that are higher than the stream's assimilative capacity.

110.    Increased suspended sediment and sedimentation from the Atlanta Training Facility construction site interfere with Intrenchment Creek's designated use by causing additional impairment to the stream's capacity to support fish and macroinvertebrates.

111.    Increased suspended sediment and sedimentation from the Atlanta Training Facility construction site interfere with Intrenchment Creek's designated use by delaying the time for Intrenchment Creek to be free from sediment that interferes with the stream's capacity to support aquatic life.

112.    Stormwater discharges that interfere with Intrenchment Creek's designated use are not in compliance with the General Permit

113.    Stormwater discharges from the Atlanta Training Facility construction site continue to violate Part I.C.4 of the general permit during storm events.

114.    Creating impervious surfaces where there used to be vegetated land cover will cause further interference with Intrenchment Creek's capacity to support fish and macroinvertebrates.

## Count 1 – Clean Water Act Violations

115.    Section 505 of the Clean Water Act authorizes citizen suits against any person, including a municipality or corporation, who is alleged to be in violation of section 301(a) of the Act or alleged to be in violation of a permit or permit condition issued under section 402 of the Act. *33 U.S.C. §§ 1362(5), 1365(a)(1), 1365(f)(1), 1365(f)(7).*

116.    Stormwater discharges from the Atlanta Training Facility construction site are causing violations of Georgia's water quality standards by interfering with Intrenchment Creek's capacity to support aquatic life.

117.    The City of Atlanta and Atlanta Police Foundation, Inc. are in violation of Section 301(a) of the Clean Water Act and Part I.C.4 of the general permit by discharging stormwater that causes impairment to Intrenchment Creek and interferes with its designated use.

## Requested Relief

Plaintiff respectfully requests:

a.    A judgment finding that defendants violated and are in violation of section 301(a) of the Clean Water Act and Part I.C.4 of the general permit.

b.    Injunctive relief requiring defendants to stop the discharge of sediment caused by construction activity at the Atlanta Training Facility construction site until Intrenchment Creek has capacity to assimilate the sediment without interfering with the stream's designated use.

c.    Such other relief to which plaintiff may be entitled at equity as is just and appropriate, or at law including under 33 U.S.C. § 1365(d).


Filed October 12, 2023.

/s/ Jon Schwartz

Jon Schwartz
Ga. Bar. No. 631038
*Attorney for Plaintiff South River Watershed Alliance, Inc.*

**Law Office of Jon Schwartz**
1100 Peachtree St., N.E., Suite 250
Atlanta, GA 30309
404-667-3047
jon@jonschwartz.net