UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SOUTH RIVER WATERSHED
ALLIANCE, INC.,

      Plaintiff,

  v.

CITY OF ATLANTA and ATLANTA
POLICE FOUNDATION, INC.,

      Defendants.

CIVIL ACTION NO.
1:23-CV-03416-JPB

## ORDER

This matter is before the Court on South River Watershed Alliance, Inc.'s

("Plaintiff") Motion for Preliminary Injunction [Doc. 15]. This Court finds as

follows:

### RELEVANT PROCEDURAL HISTORY

Plaintiff filed this action on August 1, 2023, against the City of Atlanta and

the Atlanta Police Foundation, Inc. (collectively, "Defendants") for alleged

violations of the Clean Water Act ("CWA"), brought under the CWA's citizen suit

provision. [Doc. 1]; 33 U.S.C. § 1365. This suit centers around Defendants'

construction of a law enforcement training center, the Atlanta Training Facility

(the "Facility"), on city property located in unincorporated DeKalb County. [Doc.

29, pp. 9–10]. In short, Plaintiff contends that Defendants' construction activities are discharging pollutants (here, sediment) into Intrenchment Creek via a perennial tributary located on the construction site in contravention of the CWA. <u>See</u> [Doc. 29].

On August 23, 2023, Plaintiff filed the instant Motion for Preliminary Injunction to enjoin Defendants' construction of the Facility. [Doc. 15]. Plaintiff amended its complaint on October 12, 2023. [Doc. 29]. On November 15, 2023, this Court heard oral argument on Plaintiff's preliminary injunction motion.[1] After the hearing, on November 21, 2023, Plaintiff filed a post-hearing brief in further support of its motion. [Doc. 44]. Defendant filed a response to Plaintiff's post-hearing brief on November 27, 2023. [Doc. 45]. Plaintiff's Motion for Preliminary Injunction [Doc. 15] is ripe for review.

## BACKGROUND

### 1. *Statutory Framework*

As stated above, this case involves allegations that Defendants have violated, and will continue violating, the CWA. Congress enacted the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's

---

[1] The hearing also related to Defendants' Joint Motion to Dismiss, filed on October 25, 2023. A decision on that motion will be made via subsequent order.

waters." 33 U.S.C. § 1251(a).  As such, the CWA prohibits the discharge of

pollutants from a point source into navigable waters of the United States, except in

compliance with a National Pollutant Discharge Elimination System ("NPDES")

permit.  33 U.S.C. §§ 1311, 1342.

The CWA confers jurisdiction on federal courts to hear citizen suits brought

against any entity alleged to be in violation of the Act, including violations of

NPDES permits.  33 U.S.C. § 1365(a); see, e.g., Parker v. Scrap Metal Processors,

Inc., 386 F.3d 993, 1005 (11th Cir. 2004) ("The plain language of the CWA and

the relevant case law dealing with the CWA convince us that there is federal

jurisdiction over citizen-suit claims that allege violations of a state-issued NPDES

permit.").  However, citizen suits may not be based on alleged violations that are

"wholly past."  Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc., 484

U.S. 49, 64 (1987).

## 2.      *The General Permit*

States may establish their own NPDES permit programs so long as they

meet the standards set forth in the CWA and are approved by the Administrator of

the United States Environmental Protection Agency.  Black Warrior Riverkeeper,

Inc. v. Cherokee Mining, LLC, 548 F.3d 986, 989 (11th Cir. 2008); see also 33

U.S.C. § 1342.  Georgia has established its own NPDES permitting program, and

Georgia's Environmental Protection Division ("EPD") oversees the issuance of permits. These permits may be general (applicable to more than one facility in the same industry) or individual (governing discharge for one specific facility).

In 2018, the EPD issued a general permit (the "General Permit") for stand-alone construction projects resulting in at least one acre of land disturbance. See [Doc. 15-3]. Defendants obtained coverage under the General Permit for construction of the Facility. [Doc. 29, pp. 16–17]. The General Permit requires the implementation of Best Management Practices ("BMPs") to "prevent and minimize erosion and resultant sedimentation" and "to prevent or reduce the pollution of waters of Georgia." [Doc. 15-3, pp. 4, 17]. BMPs include, for example, the use of temporary sediment basins, turbidity sampling, silt fencing and other erosion control measures. See id. at 15–17. The General Permit makes clear that failure to properly design, install or maintain the required BMPs constitutes a violation of the permit. Id. at 18.

Part I.C.4 of the General Permit specifies: "No discharges authorized by this permit shall cause violations of Georgia's in-stream water quality standards as provided by the Rules and Regulations for Water Quality Control, Chapter 391-3-6-.03." Id. at 10. The General Permit's requirements regarding BMPs are set forth

"[i]n order to ensure that the permittee's discharge(s) do not cause or contribute to a violation of State water quality standards." Id. at 15.

### 3. Alleged Violation of Part I.C.4 of the General Permit

As already explained above, the General Permit governs Defendants' construction activities in this case. Plaintiff contends that Defendants are in violation of Part I.C.4 of the General Permit, the condition that requires compliance with Georgia's in-stream water quality standards. [Doc. 29, pp. 16, 33]. Specifically, Plaintiff alleges that the following water quality standard is being violated: "All waters shall be free from material related to municipal, industrial or other discharges which produce turbidity, color, odor or other objectionable conditions which interfere with the designated use of the water body." Ga. Comp. R. & Regs. 391-3-6-.03(5)(c); [Doc. 29, pp. 11, 33].

The designated use of Intrenchment Creek is fishing and propagation of fish, shellfish, game and other aquatic life. Ga. Comp. R. & Regs. 391-3-6-.03(4)(c); 391-3-6-.03(14). However, Intrenchment Creek is included on the EPD's list of impaired waters due to degradation of its aquatic habitat caused by excess sediment. [Doc. 15-17]; see also [Doc. 15-8, p. 4]; [Doc. 15-9, p. 78]. According to Plaintiff, sediment has already degraded Intrenchment Creek "below the level

needed to fully support native species of fish and macroinvertebrates." [Doc. 15-1, pp. 3–4].

Plaintiff claims that Defendants' construction is interfering with Intrenchment Creek's designated use because stormwater from the Facility is discharged into a perennial tributary located on the construction site, which flows into Intrenchment Creek. [Doc. 29, pp. 17, 33]. Therefore, as a result of these stormwater discharges, Defendants are violating Georgia's water quality standards. Id. at 33. And, Plaintiff contends, since Part I.C.4 prohibits the violation of water quality standards, Defendants are therefore in violation of the General Permit. Id.

### 4. *Alleged Sediment Discharges in Excess of Annual Sediment Limits*

Because Intrenchment Creek is an impaired water, in compliance with the CWA, the EPD has created Total Maximum Daily Load Evaluations ("TMDLs") for Intrenchment Creek. 33 U.S.C. § 1313(d)(1)(C); [Doc. 15-8]; [Doc. 15-9]. In the TMDLs, the EPD established specific annual sediment limits necessary to protect fish and macroinvertebrates living in Intrenchment Creek. [Doc. 15-8, p. 106]; [Doc. 15-9, p. 67]. Plaintiff alleges that Defendants, through stormwater discharges from the Facility, will cause the Creek's established pollutant limits to be exceeded. [Doc. 29, p. 30].

According to Plaintiff, the maximum annual sediment limits for Intrenchment Creek have already been fully allocated among already-existing sources such that there is no remaining wasteload allocation for discharges caused by construction of the Facility. Id. at 21; [Doc. 15-1, pp. 4–5]. Thus, any stormwater discharges from the Facility's construction will cause Intrenchment Creek's pollutant limits to be exceeded and, as a result, interfere with its designated use. [Doc. 29, pp. 21, 33].

Moreover, Plaintiff alleges that if the Facility's construction is not halted, tons of sediment will be discharged into Intrenchment Creek, causing "serious and irreversible harm to native fish and macroinvertebrates already stressed by sediment loads" that are higher than the annual limits set by the EPD. [Doc. 29, pp. 30–31]. It accordingly asks this Court to enjoin construction of the Facility.

## JURISDICTION

Although Defendants' Motion to Dismiss [Doc. 34] is not presently before the Court, in it, Defendants argue, among other things, that the Court lacks subject matter jurisdiction to consider this case.[2] Id. at 3. As a threshold matter to

---

[2] Although Defendants raise arguments under Federal Rule of Civil Procedure 12(b)(1), they also acknowledge that their challenges may more appropriately be considered under different rules—specifically, Rule 12(b)(6) and Rule 12(b)(4). For the reasons stated below, the Court considers Defendants' challenges to be non-jurisdictional and will address them in a forthcoming order resolving Defendants' Motion to Dismiss.

consideration of a case, a court must always consider the question of whether it has subject matter jurisdiction.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94–95.  As such, the Court briefly addresses Defendants' arguments regarding this Court's subject matter jurisdiction before proceeding in its analysis of Plaintiff's Motion for Preliminary Injunction [Doc. 15].

Defendants first argue that the Court lacks subject matter jurisdiction because Plaintiff has not shown an "ongoing violation" of the CWA.  Defendants also assert that the Court lacks subject matter jurisdiction because Plaintiff failed to comply with the CWA's pre-suit notice requirement.

Regarding Defendants' first argument, this Court recognizes that the Supreme Court of the United States has held that citizen suits are not permitted for wholly past violations of the CWA.  Gwaltney, 484 U.S. at 64.  In bringing a citizen suit under the CWA, plaintiffs must "allege a state of either continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the future"—to invoke a federal court's jurisdiction.  Atl. States Legal Found., Inc. v. Tyson Foods, Inc., 897 F.2d 1128, 1133 (11th Cir. 1990) (citing Gwaltney, 484 U.S. at 57).

In the instant case, Defendants contend that the CWA violation Plaintiff alleges is "not supported by law."  [Doc. 34, p. 12].  Defendants' argument, then,

seems to be that since there is no violation supported by law, there can be no *ongoing* violation (as is required by Gwaltney); thus, there is no basis for subject matter jurisdiction. 484 U.S. at 64; [Doc. 34, p. 12]. However, the Supreme Court's holding in Gwaltney instructs federal courts to assess their subject matter jurisdiction over CWA citizen suits by considering whether the alleged violation of a citizen-suit defendant is based on activity that occurred entirely in the past—not whether the activity in fact violates the CWA. See 484 U.S. at 64. Indeed, whether there has a been discharge in violation of an NPDES permit—and therefore a violation of the CWA—is a key merits question in cases such as this. See, e.g., New Manchester Resort & Golf, LLC v. Douglasville Dev., LLC, 734 F. Supp. 2d 1326, 1336 (N.D. Ga. 2010).

Here, Defendants neither contend that their construction activities are wholly in the past nor submit extrinsic evidence suggesting that their alleged violation was a one-time, past occurrence. As such, despite framing their challenge as a factual attack on the Court's subject matter jurisdiction, the Court finds that Defendants' arguments on this point (*i.e.*, that there has been no violation as a matter of law) are more properly construed as attacks on whether Plaintiff has stated a claim for relief under Rule 12(b)(6).

Second, Defendants argue that the Court lacks jurisdiction because Plaintiff failed to comply with the CWA's pre-suit notice requirement, a prerequisite for filing a citizen suit under the CWA. <u>See</u> 33 U.S.C. § 1365(b); <u>Nat'l Env't Found. v. ABC Rail Corp.</u>, 926 F.2d 1096, 1097 (11th Cir. 1991). In their brief, Defendants explain that some courts have treated pre-suit notice challenges as jurisdictional attacks under Rule 12(b)(1), while other courts in this Circuit have evaluated pre-suit notice challenges (or like challenges) under Rules 12(b)(4) and 12(b)(6). Specifically, in <u>South River Watershed Alliance, Inc. v. Dekalb County, Georgia</u>, the Eleventh Circuit Court of Appeals held that a similar defense (the "diligent prosecution bar," located in the same subsection of the CWA as pre-suit notice) was a non-jurisdictional issue, determining that the district court was correct in evaluating the challenge under Rule 12(b)(6). 69 F.4th 809, 822–23 (11th Cir. 2023). In <u>Boring v. Pattillo Industrial Real Estate</u>, another court in the Northern District of Georgia found that Rule 12(b)(4) was the appropriate avenue to address the sufficiency of pre-suit notice. 426 F. Supp. 3d 1341, 1345 (N.D. Ga. 2019).

The Court is not convinced that it lacks jurisdiction even if Plaintiff failed to comply with the pre-suit notice requirement. Relying on the cases cited above, the Court does not construe Defendants' arguments regarding pre-suit notice as a

challenge to this Court's subject matter jurisdiction and reserves judgment until it resolves the motion to dismiss.

In sum, the Court has considered Defendants' jurisdictional arguments and is satisfied that subject matter jurisdiction exists in this case. Here, Plaintiff alleges an ongoing violation of the CWA, and whether the CWA is violated is a quintessential federal question.

## LEGAL STANDARD

Plaintiff seeks a preliminary injunction in this case. A plaintiff seeking preliminary injunctive relief must show (1) a substantial likelihood of success on the merits; (2) irreparable injury absent an injunction; (3) that the balance of equities is in his favor; and (4) that an injunction would not be adverse to the public interest. Sofarelli v. Pinellas County, 931 F.2d 718, 723–24 (11th Cir. 1991). Because a preliminary injunction "is an extraordinary and drastic remedy," the Court may not issue such relief "unless the movant clearly establish[es] the burden of persuasion as to each of the four prerequisites." Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000) (internal punctuation omitted) (quoting McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998)). Granting a preliminary injunction is thus the exception rather than the rule. See id.

## 1. Likelihood of Success on the Merits

To obtain a preliminary injunction, the moving party must show a substantial likelihood that he will ultimately prevail on the merits of his claim. Sofarelli, 931 F.2d at 723. This factor is generally considered the most important of the four factors, see Garcia-Mir v. Meese, 781 F.2d 1450, 1453 (11th Cir. 1986), and failure to satisfy this burden—as with any of the other prerequisites—is fatal to the claim, see Siegel, 234 F.3d at 1176.

In order to succeed on the merits of its CWA claim, a plaintiff must prove that (1) there has been a discharge; (2) of a pollutant; (3) into waters of the United States; (4) from a point source; (5) without—or in violation of—a NPDES permit. See Parker, 386 F.3d at 1008. The instant case primarily turns on whether there has been a violation of an NPDES permit—specifically, the General Permit.

To begin, the parties disagree about whether a violation of the General Permit's Part I.C.4., which prohibits violation of Georgia's water quality standards, standing alone, may form the basis of Plaintiff's citizen suit. See [Doc. 46, pp. 26–27, 58, 70]; see also [Doc. 44]; [Doc. 45]. Plaintiff directed the Court to two cases in this district demonstrating that it can. Indeed, in Draper v. Roberts Family, LLC, United States District Judge Clarence Cooper held that "any discharge of storm water . . . that causes a violation of Georgia's Water Quality Standards is a

violation of the General Permit." No. 1:06-CV-3057-CC, 2009 WL 10668404, at *23 (N.D. Ga. Mar. 30, 2009). Similarly, in <u>New Manchester Resort & Gold, LLC v. Douglasville Development, LLC</u>, United States District Judge Thomas Thrash reasoned that the plaintiff in that case could "prove a violation [of an NPDES permit] by showing that the [d]efendants caused a violation of Georgia's in-stream water quality standards." 734 F. Supp. 2d at 1337. As such, the Court is satisfied that a violation of Part I.C.4. of the General Permit, if established, can serve as the basis for Plaintiff's suit.

Unlike those two cases, however—where the records showed a lack of adherence to other substantive requirements of an NPDES permit[3]—Plaintiff here alleges that, given the impaired state of Intrenchment Creek and already-allocated wasteload limitations, even perfect compliance with all other provisions of the General Permit will nonetheless cause a violation of water quality standards and therefore will violate Part I.C.4 (prohibiting discharges that cause a violation of water quality standards). The water quality standard that Plaintiff claims has been violated reads as follows: "All waters shall be free from material related to municipal, industrial or other discharges which produce turbidity, color, odor or

---

[3] For example, the Court in <u>Draper</u> noted that the record was "replete with evidence of instances where the [defendants] did not ensure the installation and maintenance of best management practices." 2009 WL 10668404, at *17.

other objectionable conditions which interfere with the designated use of the water body." Ga. Comp. R. & Regs. 391-3-6-.03(5)(c). Thus, to establish a violation of this standard, Plaintiff must prove that discharges from the construction of the Facility interfere with Intrenchment Creek's designated use, which is fishing and propagation of fish, shellfish, game and other aquatic life. Ga. Comp. R. & Regs. 391-3-6-.03(4)(c); 391-3-6-.03(14).

Although they work in tandem, and Plaintiff addresses them in unison in its brief, the Court understands Plaintiff's arguments regarding Defendants' interference with the designated use of Intrenchment Creek as two-fold. First, Plaintiff argues that because the EPD, through TMDLs, has established total allowable sediment loads for Intrenchment Creek and has already allocated all of Intrenchment Creek's annual sediment limits among sources other than stormwater discharge from the Facility, any stormwater discharge by Defendants will necessarily cause the limits to be exceeded. Plaintiff's view is that this is true even if the stormwater discharges are in perfect compliance with every other provision of the General Permit. And, Plaintiff argues, because the TMDLs' limits reflect the EPD's judgment on Intrenchment Creek's assimilative capacity to support aquatic life, exceeding those limits will *necessarily* interfere with Intrenchment

Creek's designated use of fishing and the propagation of fish, shellfish, game and other aquatic life.

Second, Plaintiff argues that despite what the General Permit says its BMPs are designed to do—that is, to avoid contributing sediment to the creek—construction of the Facility, in reality, is going to "load" hundreds of tons of sediment into Intrenchment Creek during each storm, which will "cause serious and irreversible harm to fish and macroinvertebrates already stressed by existing sediment loads that are much higher than the annual limits set by [the] EPD." [Doc. 15-1, p. 15]. Under Plaintiff's second argument, the Court need not rely on the limits contained in the TMDLs in order to find interference with Intrenchment Creek's designated use (except insofar as they speak to the already-impaired state of Intrenchment Creek and how much additional sediment the EPD has determined that it can take).

### i.    Exceeding TMDL Annual Sediment Limits

As proof that construction of the Facility will cause a violation of water quality standards, Plaintiff first points to the TMDLs themselves, arguing that the purpose of the allowable total sediment loads contained therein is to establish "the maximum amount of sediment 'that can be assimilated by' impaired streams 'without causing additional impairment'" to a stream's designated use. [Doc. 21,

p. 4]. Plaintiff contends that the sediment load limits "reflect [the] EPD's judgment on Intrenchment Creek's assimilative capacity." [Doc. 21, p. 4]. In other words, the limits demonstrate the amount of sediment that can be assimilated by Intrenchment Creek without violating water quality standards, and stormwater discharges due to construction of the Facility will exceed these limits and "further degrade the aquatic habitat and cause additional impairment to [Intrenchment Creek's] capacity to support aquatic life." [Doc. 21, p. 4]. In short, Plaintiff contends that the limits themselves are sufficient evidence of the amount of sediment Intrenchment Creek can withstand without interfering with its designated use, and because the limits will necessarily be exceeded by construction of the Facility, Defendants violate water quality standards.

However, Defendants put forth evidence that the TMDLs were established *with future construction under the General Permit in mind*—that is, that stormwater discharges from the Facility's construction are already included in the TMDL limits that Plaintiff relies on. Defendant submitted the affidavit of Anna Truszczynski, Watershed Protection Branch Chief at the EPD, who oversees the EPD's delegated CWA programs, including the NPDES permitting process; NPDES compliance and enforcement; and water quality standards development. [Doc. 19-1, p. 3]. In her affidavit, Truszczynski explained that "if the effluent

16

limitations in the 2018 General Permit are followed, namely the specified BMPs, the amount of sediment discharged is *already accounted* for and is in conformance with the assumptions made in the TMDLs to achieve required water quality standards." Id. at 10–11 (emphasis added). As such, Truszczynski's affidavit indicates that the Facility's discharges—if discharged in accordance with the terms of the General Permit—will not contribute sediment over what has already been allocated (as Plaintiff contends) and therefore do not exceed the limits stated in the TMDLs.[4] Id.

Moreover, Truszczynski explains that when Plaintiff petitioned the EPD to require an individual permit for the Facility's construction, the EPD determined that "the terms of the 2018 General Permit were adequately protective of Intrenchment Creek," as those terms are "the most effective means of *ensuring compliance with the relevant TMDLs*." [Doc. 19-1, pp. 13–14] (emphasis added). Indeed, the TMDLs themselves state that "[t]he conditions of the permit were established to assure that the storm water runoff from these sites does not cause or contribute sediment to the stream" and that "compliance with the terms and

---

[4] Indeed, given the TMDLs and wasteload allocation applicable to Intrenchment Creek, the fact that the EPD allowed Defendant to be covered under the General Permit at all supports this interpretation. Because, viewed through the lens Plaintiff advocates for, there is no possible way for Defendants to construct the Facility in compliance with the NPDES permit that the EPD granted them.

conditions of the permit is effective implementation" of wasteload allocation "and demonstrates consistency with the assumptions and requirements of the TMDL." [Doc. 15-8, p. 91]; [Doc. 15-9, p. 61].

Given this evidence, the Court cannot find that the Facility's stormwater discharges—if discharged pursuant to the terms of the General Permit—will *necessarily* exceed the limits created by the TMDLs. As such, even if the Court agreed that exceeding such limits were sufficient proof of interference with Intrenchment Creek's designated use, the Court cannot find that Plaintiff is substantially likely to succeed on the merits on this ground alone.

      ii.      *Excess Sediment Discharges*

However, irrespective of whether the TMDLs' wasteload allocations for Intrenchment Creek contemplated future stormwater discharges of the Facility, if Plaintiff proves that, in actuality, Defendants are contributing so much sediment to Intrenchment Creek that they will interfere with its designated use, Plaintiff can prove that Defendants have violated Georgia Water Quality Standard 391-3-6-.03(5)(c) (and, therefore, Part I.C.4 of the General Permit). Here, Plaintiff claims that stormwater discharges from the Facility will increase suspended sediment and sedimentation, further degrading Intrenchment Creek's aquatic habitat. [Doc. 15-1, p. 11]. Indeed, Plaintiff contends that construction activity at the Facility will

load "hundreds of tons" of sediment into Intrenchment Creek—well beyond its limits—which will harm Intrenchment Creek's fish and macroinvertebrates, thereby interfering with its designated use of fishing and the propagation of fish, shellfish, game and other aquatic life. Id. at 15.

As evidence of this, Plaintiff has produced photographs of Intrenchment Creek and the perennial tributary located on the Facility's construction site and argues that the photographs show sediment from the tributary being loaded into Intrenchment Creek. [Doc. 15-14]; [Doc. 15-15]; [Doc. 15-16]. Additionally, Plaintiff points to the declaration of Amy Taylor (who took some of the photographs upon which Plaintiff relies), which states that during every rain event that Taylor observed at the Facility's construction site, "[the tributary] conveyed visibly polluted stormwater into Intrenchment Creek." [Doc. 15-16, p. 2]. Plaintiff also relies upon the declaration of Joe Peery, who has hiked, biked and explored the city property upon which Defendants are now constructing for more than a decade. [Doc. 16, p. 2]. Peery states that the Facility's tributary did not convey visibly polluted water into Intrenchment Creek before the site was cleared as part of the Facility's construction and that the Facility's construction site "is the only land disturbing activity discharging sediment into this tributary." Id. at 7. Plaintiff also brought evidence that such sediment will likely have harmful effects on the

fish and macroinvertebrates living in Intrenchment Creek, including mortality and impairment of their reproduction and growth. [Doc. 15-11, p. 3].

Defendants respond that Plaintiff's photographs do not establish that any sedimentation of Intrenchment Creek has been caused by Defendants, noting that the photos do not show "active or historical erosion or discharge locations from the disturbed [Facility] site." [Doc. 19, p. 14]. Indeed, Defendants argue that there are other potential sources of any sedimentation observed by Plaintiff. Id. Specifically, Defendants note that the photographs upon which Plaintiff relies were taken roughly 1,900 feet downstream of the discharge authorized by the General Permit. Id. at 13. And, through the affidavit of Alan Williams (who manages and oversees the Facility's construction), Defendants aver that "[w]ithin the roughly 1,900 feet of the unnamed tributary near the Training Center, there are several potential, non-regulated sources that could be causing the turbidity of the water in the relevant area of Intrenchment Creek, including activities by and in response to trespassers, operational activities by easement holders, and historical (and unauthorized) all-terrain vehicle recreational trails." [Doc. 19-9, p. 14]. Moreover, Defendants contend that Plaintiff's own declarations support that the turbidity

observed by Plaintiff is "likely from the unstable and eroded streambanks and walking trails among the creek's edge."[5] [Doc. 19, p. 14].

Defendants also presented evidence showing that compliance with the BMPs in the General Permit means that Defendants *will not* contribute excess sediment to Intrenchment Creek. See [Doc. 19-9, pp. 6, 13]; [Doc. 19-13, pp. 7–8]; [Doc. 19-14, p. 6]. Just as Plaintiff relies on the EPD's judgment in arguing that sediment that exceeds the limits of the TMDLs necessarily demonstrates interference with designated use, Defendants point to the EPD's statement in the TMDLs that "[t]he conditions of the [General P]ermit were established to assure that the storm water runoff from these sites *does not cause or contribute sediment to the stream*." [Doc. 15-8, p. 91] (emphasis added).

Indeed, Defendants point out that the General Permit itself describes BMPs as being required "[i]n order to ensure that the permittee's discharge(s) do not cause or contribute to a violation of State water quality standards." [Doc. 15-3, p. 15]. In her affidavit, Anna Truszczynski explained that the "EPD develops NPDES construction stormwater general permits, consistent with [CWA]

---

[5] Plaintiff acknowledges Intrenchment Creek's eroding streambanks but argues that pollution caused by this erosion is separate from what has been photographed, pointing to the differences in color from the streambank soil and the alleged discharge from the Facility. [Doc. 21, p. 9].

requirements, that are water-quality based with numeric limits that, if met, will not cause a water quality problem." Id. at 4. Moreover, Truscynzski explained that "the construction stormwater general permits include requirements relevant to discharges into impaired waters, in the form of supplemental or extra [BMPs]." Id. at 4–5. Put simply, Defendants' position is that "[i]f the terms of the general permits are followed, the discharge of pollutants, including sediment, into waters of the state is prevented and minimized and will not result in a violation of . . . water quality standards." Id. at 6.

As such, Defendants have brought evidence demonstrating that they have implemented and maintained the BMPs required by the general permit, including the installation of appropriate erosion control measures. See [Doc. 19-9]; [Doc. 19-13]; [Doc. 19-14]. Additionally, Defendants submit evidence through the declarations of Jeremiah Phillips (a Georgia Soil and Water Conservation Commission certified Level II Certified Design Professional) and Jessica Webster (a Georgia Soil and Water Conservation Commission certified Level IA Erosion and Sediment Inspector). [Doc. 19-13]; [Doc. 19-14]. In their declarations, Phillips and Webster both state that they have not observed sediment emanating from the construction site. [Doc. 19-13, p. 8]; [Doc. 19-14, p. 6]. Furthermore, Webster explained that testing at the construction site showed "that increase in

turbidity indicated by instream sampling was negligible and within the limits set by the General Permit, and that the outfall sampling was well below the 50-NTU limit." [Doc. 19-14, p. 8]. Moreover, at Oral Argument, defense counsel argued that the empirical evidence in the record shows there was less in-stream siltation in Intrenchment Creek *below* the project than above the project (as further proof that the Facility's construction discharges are not contributing additional sediment to the stream).[6] [Doc. 46, pp. 41–42].

In sum, Plaintiff has brought evidence showing that sediment is being discharged into Intrenchment Creek, that excess sediment will cause harm to the aquatic species residing there and at least some evidence indicating that the sediment observed in the creek has been caused by the Defendants. However, Defendants put forth evidence showing that compliance with the General Permit's BMPs prevents the discharge of enough sediment to cause a water quality problem, and Defendants are complying with those BMPs (including the additional BMPs required for impaired waters like Intrenchment Creek). Moreover, Defendants submitted evidence of construction site testing that indicates the BMPs are working as designed, and Defendants are not contributing excess sediment to the stream.

---

[6] Plaintiff's counsel disputes Defendants' evidence, pointing to the supplemental declaration of Evan Hansen, which states that the turbidity sampling upon which Defendants rely was improperly conducted. See [Doc. 25-1]; [Doc. 46, p. 82].

As a result, the Court cannot find—at this stage of the proceedings—that Plaintiff has presented enough evidence to *prove* there is a substantial likelihood that Defendants' construction of the Facility is discharging enough sediment to interfere with Intrenchment Creek's designated use (and thereby violate Georgia's water quality standards).  Since Plaintiff's CWA case hinges on Defendants' alleged violation of the General Permit provision that prohibits violation of Georgia's water quality standards, the Court likewise cannot find that there is a substantial likelihood that the CWA has been violated.

### 2.  *Other Preliminary Injunction Requisites*

As explained in detail above, Plaintiff failed to show a substantial likelihood of success on the merits of its CWA citizen suit claim.  Therefore, this Court need not address whether Plaintiff will be irreparably harmed should an injunction not issue, whether an injunction is adverse to the public interest or whether the balance of equities favors injunctive relief.  See Church v. City of Huntsville, 30 F.3d 1332, 1342 (11th Cir. 1994) (recognizing that when plaintiffs fail to establish a substantial likelihood of success on the merits, the other prerequisites need not be addressed).

## CONCLUSION

At least at this stage of the case, Plaintiff has not provided enough evidence to warrant the "extraordinary and drastic remedy" of a preliminary injunction. Siegel, 234 F.3d at 1176 (11th Cir. 2000) (internal punctuation omitted) (quoting Robertson, 147 F.3d at 1306). As such, for the reasons explained above, Plaintiff's Motion for Preliminary Injunction [Doc. 15] is **DENIED**.

**SO ORDERED** this 16th day of January, 2024.

J. P. BOULEE
United States District Judge