UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| SOUTH RIVER WATERSHED ALLIANCE, INC., | |
| Plaintiff, | |
| v. | CIVIL ACTION NO. 1:23-CV-03416-JPB |
| CITY OF ATLANTA and ATLANTA POLICE FOUNDATION, INC., | |
| Defendants. | |

## ORDER

This matter is before the Court on the City of Atlanta and Atlanta Police Foundation, Inc.'s (collectively, "Defendants") Joint Motion to Dismiss [Doc. 34]. This Court finds as follows:

## BACKGROUND

South River Watershed Alliance, Inc. ("Plaintiff") filed the instant action on August 1, 2023, against Defendants for alleged violations of the Clean Water Act ("CWA"), brought under the CWA's citizen suit provision. 33 U.S.C. § 1365. This suit centers around Defendants' construction of a law enforcement training center, the Atlanta Training Facility (the "Facility"), on city property located in unincorporated DeKalb County. [Doc. 29, pp. 9–10]. In short, Plaintiff contends

that Defendants' construction activities are discharging pollutants (*i.e.*, sediment) into Intrenchment Creek via a perennial tributary located on the construction site in contravention of the CWA. See id.

### 1. Statutory Framework

Congress enacted the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). As such, the CWA prohibits the discharge of pollutants from a point source into navigable waters of the United States, except in compliance with a National Pollutant Discharge Elimination System ("NPDES") permit. 33 U.S.C. §§ 1311, 1342.

The CWA confers jurisdiction on federal courts to hear citizen suits brought against any entity alleged to be in violation of the Act, including violations of NPDES permits. 33 U.S.C. § 1365(a); see, e.g., Parker v. Scrap Metal Processors, Inc., 386 F.3d 993, 1005 (11th Cir. 2004) ("The plain language of the CWA and the relevant case law dealing with the CWA convince us that there is federal jurisdiction over citizen-suit claims that allege violations of a state-issued NPDES permit."). However, citizen suits may not be based on alleged violations that are "wholly past." Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc., 484 U.S. 49, 64 (1987).

**2.** **The General Permit**

States may establish their own NPDES permit programs so long as the

permit programs meet the standards set forth in the CWA and are approved by the

Administrator of the United States Environmental Protection Agency. Black

Warrior Riverkeeper, Inc. v. Cherokee Mining, LLC, 548 F.3d 986, 989 (11th Cir.

2008); see also 33 U.S.C. § 1342. Georgia has established its own NPDES

permitting program, and Georgia's Environmental Protection Division ("EPD")

oversees the issuance of permits. These permits may be general (applicable to

more than one facility in the same industry) or individual (governing discharge for

one specific facility).

In 2018, the EPD issued a general permit for stand-alone construction

projects resulting in at least one acre of land disturbance. See GA. ENV.

PROTECTION DIV., GENERAL NPDES PERMIT NO. GAR 100001 (2018) (hereinafter,

the "General Permit"). Defendants obtained coverage under the General Permit for

construction of the Facility. [Doc. 29, pp. 7–8].

The General Permit requires the implementation of Best Management

Practices ("BMPs") to "prevent and minimize erosion and resultant sedimentation"

and "to prevent or reduce the pollution of waters of Georgia." General Permit at

13. BMPs include, for example, the use of temporary sediment basins, turbidity

sampling, silt fencing and other erosion control measures. See id. at 15–17. The General Permit makes clear that failure to properly design, install or maintain the required BMPs constitutes a violation of the permit, and these requirements are set forth "[i]n order to ensure that the permittee's discharge(s) do not cause or contribute to a violation of State water quality standards." Id. at 15, 18. Even so, Part I.C.4 of the General Permit separately provides: "No discharges authorized by this permit shall cause violations of Georgia's in-stream water quality standards as provided by the Rules and Regulations for Water Quality Control, Chapter 391-3-6-.03." Id. at 10.

### 3. Alleged Violation of the General Permit

Here, Plaintiff contends that Defendants are in violation of Part I.C.4 of the General Permit because they are violating Georgia's water quality standards. [Doc. 29, p. 30]. Specifically, Plaintiff alleges that Defendants are violating the following standard: "All waters shall be free from material related to municipal, industrial or other discharges which produce turbidity, color, odor or other objectionable conditions which interfere with the designated use of the water body." Ga. Comp. R. & Regs. 391-3-6-.03(5)(c); [Doc. 29, pp. 16, 33]. The designated use of Intrenchment Creek is fishing and propagation of fish, shellfish,

game and other aquatic life.  Ga. Comp. R. & Regs. 391-3-6-.03(4)(c); 391-3-6-.03(14).

Plaintiff claims that (1) stormwater from the Facility is being discharged into a perennial tributary located on the construction site that flows into Intrenchment Creek; and (2) Defendants' discharges are interfering with Intrenchment Creek's designated use of fishing and propagation of fish, shellfish, game and other aquatic life.  Id. at 17, 33.  Plaintiff explains that Intrenchment Creek is already included on the EPD's list of impaired waters due to degradation of its aquatic habitat caused by excess sediment.  [Doc. 29, p. 17].[1]  Accordingly, the EPD has established Total Maximum Daily Load Evaluations ("TMDLs") for Intrenchment Creek, which set maximum annual sediment limits necessary to protect fish and macroinvertebrates living there.  See 33 U.S.C. § 1313(d)(1)(C).  Plaintiff asserts that these limits have already been fully allocated among already-existing sources such that there is no remaining waste load allocation for discharges caused by construction of the Facility; as a result, Plaintiff contends that any stormwater discharge from the Facility will necessarily cause Intrenchment

---

[1] Indeed, Plaintiff claims that sediment has already degraded Intrenchment Creek below the level needed to fully support its native species of fish and macroinvertebrates.  [Doc. 29, p. 14].

Creek's established pollutant limits to be exceeded, which Plaintiff argues demonstrates interference with its designated use. [Doc. 29, p. 30]. But Plaintiff also separately alleges that Defendants' construction will cause "at least several tons" of sediment to be discharged into Intrenchment Creek, which will cause "serious and irreversible harm to native fish and macroinvertebrates already stressed by sediment loads." Id. at 30–31.

Accordingly, as a result of these stormwater discharges, Plaintiff asserts that Defendants are violating Georgia's water quality standards. Id. at 33. And, since Part I.C.4 of the General Permit prohibits the violation of water quality standards, Defendants are therefore in violation of the General Permit, in contravention of the CWA. Id.

## PROCEDURAL HISTORY

On September 21, 2023, Defendants filed an initial motion to dismiss Plaintiff's case. [Doc. 22]. However, on October 12, 2023, Plaintiff amended its complaint, rendering Defendants' motion moot. See [Doc. 29]. As a result, this Court denied Defendants' original motion to dismiss without prejudice on October 16, 2023. [Doc. 30]. Thereafter, based on Plaintiff's amended complaint, Defendants filed the instant motion to dismiss on October 25, 2023. [Doc. 34]. Plaintiff filed its response in opposition to Defendants' motion on November 7,

2023.  On November 15, 2023, this Court heard oral argument from the parties,[2] and they subsequently filed post-hearing briefs.  [Docs. 44, 45].  Defendants' joint motion is ripe for review.

## LEGAL STANDARD

"At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff."  Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1273 n.1 (11th Cir. 1999).  In determining whether an action should be dismissed for failure to state a claim, Federal Rule of Civil Procedure 8(a)(2) provides that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  The pleading must contain more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  Importantly, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Id. (quoting Twombly, 550 U.S. at 570).  Detailed factual allegations are not necessary; a plaintiff's statement need only give the defendant fair notice of the plaintiff's claim

---

[2] The hearing also related to Plaintiff's Motion for Preliminary Injunction, [Doc. 15], which this Court denied on January 16, 2024, [Doc. 47].

and the grounds upon which it rests.  See Erickson v. Pardus, 551 U.S. 89, 93

(2007) (citing Twombly, 550 U.S. at 555).

## ANALYSIS

In this case, Plaintiff has filed a CWA citizen suit.  To bring such a suit, a

plaintiff must allege that (1) there has been a discharge; (2) of a pollutant; (3) into

waters of the United States; (4) from a point source; (5) without—or in violation

of—a NPDES permit.  See Parker, 386 F.3d at 1008.  Here, Plaintiff claims that

Defendants are running afoul of the CWA by violating a NPDES permit.

Specifically, Plaintiff contends that Defendants are violating Part I.C.4. of the

General Permit, which prohibits violation of Georgia's water quality standards.

In their joint motion, Defendants make several arguments for dismissal.  See

[Doc. 34].  First, Defendants claim that an alleged violation of Part I.C.4 of the

General Permit, alone, cannot serve as the basis for Plaintiff's CWA citizen suit.

Defendants also argue that another part of the General Permit (the "BMP Defense"

provision) provides a complete defense to Plaintiff's allegations.  Defendants

further contend that Plaintiff has failed to state a claim because it did not plead

"unreasonable interference" with Intrenchment Creek's designated use as required

by Altamaha Riverkeeper, Inc. v. Rayonier Performance Fibers, 816 S.E.2d 125,

131 (Ga. Ct. App. 2018), nor did it plead an "ongoing violation" of the CWA as

required by Gwaltney, 484 U.S. at 64.  Defendants also claim that Plaintiff failed to comply with the CWA's pre-suit notice requirement, a prerequisite for filing its citizen suit.  See 33 U.S.C. § 1365(b); Nat'l Env't Found. v. ABC Rail Corp., 926 F.2d 1096, 1097 (11th Cir. 1991).  And, finally, Defendants assert that Plaintiff's case is, in actuality, an impermissible collateral attack on a prior agency decision and argue that this Court should abstain from resolving Plaintiff's claim pursuant to Burford v. Sun Oil Co., 319 U.S. 315 (1943).

The Court discusses each of these arguments below.

1. **Violation of the General Permit Through Violation of Part I.C.4.**

Defendants first challenge the sufficiency of Plaintiff's claim by asserting that an alleged violation of *only* Part I.C.4. of the General Permit—and none of its other, more substantive provisions—cannot form the basis of Plaintiff's CWA citizen suit.  The Court agrees with Defendants that the intent of the General Permit's more technical requirements is to prevent violation of Georgia's water quality standards; the General Permit's own terms make that clear.  See, e.g., General Permit at 15 (providing that certain BMPs are required "*to ensure* that the permittee's discharge(s) *do not cause or contribute to a violation* of State water quality standards. . . ." (emphasis added)).

Even so, the General Permit unambiguously includes an independent requirement in Part I.C.4 that "[n]o discharges authorized by this permit shall cause violations of Georgia's in-stream water quality standards as provided by the Rules and Regulations for Water Quality Control, Chapter 391-3-6-.03." Id. at 10. The Court cannot ignore this express provision. To read the General Permit as Defendants propose—*i.e.*, that it is not possible for a permitee to violate Georgia's water quality standards if in compliance with the permit's more technical requirements—would render Part I.C.4. meaningless. See In re FFS Data, Inc., 776 F.3d 1299, 1305 (11th Cir. 2015) ("[A]n interpretation [of a contract] which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect." (quoting Restatement (Second) of Contracts § 203(a))).[3] Accordingly, the Court finds that if Plaintiff can prove that Defendants are violating Georgia's water quality standards, then Defendants violate Part I.C.4 of the General Permit and the CWA.

---

[3] "To interpret [a] NPDES permit, the Court must adhere to the standard principles of contract law." Jones Creek Invs., LLC v. Columbia Cnty., Ga., 98 F. Supp. 3d 1279, 1299 (S.D. Ga. 2015).

Additionally, the Court notes that other judges in this district have reached the same conclusion. [Doc. 47, p. 12–13]. In Draper v. Roberts Family, LLC, United States District Judge Clarence Cooper decided that "any discharge of storm water . . . that causes a violation of Georgia's Water Quality Standards is a violation of the General Permit." No. 06-CV-3057-CC, 2009 WL 10668404, at *23 (N.D. Ga. Mar. 30, 2009). Similarly, in New Manchester Resort & Gold, LLC v. Douglasville Development, LLC, United States District Judge Thomas Thrash explained that the plaintiff in that case could "prove a violation [of an NPDES permit] by showing that the [d]efendants caused a violation of Georgia's in-stream water quality standards." 734 F. Supp. 2d 1326, 1337 (N.D. Ga. 2010). This Court agrees with the reasoning and conclusion of those cases.

For all these reasons, the Court cannot grant Defendants' motion to dismiss on this ground.[4]

---

[4] Defendants make a similar argument regarding the water quality standard that Plaintiff alleges Defendants are violating. Defendants assert that Plaintiff's claim cannot stand on an alleged violation of 391-3-6-.03(5)(c) "without substantive discussion of the more specific turbidity standard in . . . 391-3-6-.03(5)(d)." [Doc. 34, p. 19]. However, like with Part I.C.4. of the General Permit, subsection (5)(c) provides a distinct requirement that "[a]ll waters shall be free from material related to municipal, industrial or other discharges which produce turbidity, color, odor or other objectionable conditions which interfere with the designated use of the water body." See Ga. Comp. R. & Regs. 391-3-6-.03(5)(c). This standard is not restricted by the separate requirements of (5)(d). Indeed, the introductory language of subsection (5)(d) makes this clear: "The following standard is in addition to the narrative turbidity standard in Paragraph 391-3-6-.03(5)(c)." Ga.

## 2. *The General Permit's BMP Defense*

Defendants also contend that the "BMP Defense," included in Part III.D.1. of the General Permit, provides a complete defense to Plaintiffs' allegations. The BMP Defense provides as follows: "Proper design, installation, and maintenance of best management practices shall constitute a complete defense to any action by the Director or to any other allegation of noncompliance with Part III.D.4. and Part III.D.F." General Permit at 17. The unambiguous language of the BMP Defense restricts its application to alleged violations of the terms set forth in Parts III.D.4. and III.D.F. of the General Permit. Here, Plaintiff alleges that Defendants have violated Part I.C.4. Thus, the Court finds that the BMP Defense does not apply to Plaintiff's allegations in this case.[5]

## 3. *Unreasonable Interference under <u>Rayonier</u>*

Defendant's next argument for dismissal is based upon the Georgia Court of Appeals' decision in <u>Altamaha Riverkeeper, Inc. v. Rayonier Performance Fibers</u>.

---

Comp. R. & Regs. 391-3-6-.03(5)(d) (emphasis added). Thus, for similar reasons, this argument is unavailing.

[5] Judge Cooper reached this same conclusion in <u>Draper</u>. 2009 WL 10668404, at *23 (explaining that the BMP Defense, by its own terms, applies only to alleged violations of two specific provisions of the General Permit and that "[t]here is no such defense applicable to an allegation of violation of Georgia's Water Quality Standards").

816 S.E.2d at 131. In that case, the court considered the proper interpretation of Ga. Comp. R. & Regs. 391-3-6-.03(5)(c), which, at that time, provided as follows: "All waters shall be free from material related to municipal, industrial or other discharges which produce turbidity, color, odor or otherwise objectionable conditions which interfere with legitimate water uses." See Rayonier, 816 S.E.2d at 127. The Georgia Court of Appeals considered the superior court's conclusion that the regulation must be interpreted to prohibit only "unreasonable" interference with legitimate water uses, rather than *any* interference (as an Administrate Law Judge had previously determined). Id. Ultimately, the appellate court affirmed the lower court's decision. Id. at 131.

Relying on this case, Defendants assert that Plaintiff has failed to state a claim because it has not pled *unreasonable* interference with Intrenchment Creek's designated use. [Doc. 34, pp. 16–17]. Defendants argue: "Given the construction placed on 5(c) by the Georgia Court of Appeals that the 'narrative standard only prohibits "unreasonable" interference,' . . . the proper governing standard requires an allegation that a violation unreasonably interferes with a water body's designated use. SWRA fails to make that allegation and cannot." Id. at 18.

Problematically, though, the Georgia Court of Appeals was considering a prior version of the regulation. As stated above, the language of 391-3-6-.03(5)(c)

at that time prohibited conditions "which interfere with *legitimate water uses*."

See Rayonier, 816 S.E.2d at 127 (emphasis added). That language has since been

updated to read as follows: "All waters shall be free from material related to

municipal, industrial or other discharges which produce turbidity, color, odor or

other objectionable conditions which interfere with *the designated use* of the water

body." Ga. Comp. R. & Regs. 391-3-6-.03(5)(c) (emphasis added). The mere fact

that the Rayonier court was considering a different regulation would be sufficient

for this Court to find Defendants' *stare decisis* arguments unavailing.

But upon close review of the Rayonier court's reasoning, it becomes even

clearer to this Court that to insert the word "unreasonable" into the current

regulation would be inappropriate. In coming to its decision in Rayonier, the court

relied upon EPD's judgment that "[narrative water quality] standards must be

considered in the context of the particular water's 'designated use.'" Id. at 130.

Because the ALJ's interpretation of the "any interference" standard would have

applied "to all waterways and for all legitimate use*s, without exception and without*

*consideration of the designated use of the waterway*," the Rayonier court found

that "[i]t was proper for the EPD to interpret the narrative standard as *not intended*

*to convert the designated use of a water body to a more protected use*." 816

S.E.2d at 127 (emphasis added). Today, the regulation has been revised in a way

that addresses this precise issue; now, the standard prohibits interference *only* with

the water's designated use, as opposed to any legitimate water uses.

Moreover, the Court is especially skeptical of Defendants' position in light

of the thirteenth footnote of the Rayonier decision, which explains:

> During the pendency of this appeal, it is undisputed that the Board
> amended the narrative standard to provide: "All waters shall be free
> from material related to municipal, industrial or other discharges
> which produce turbidity, color, odor or other objectionable conditions
> which *unreasonably interfere* with the designated use of the water
> body." Ga. Comp. R. & Regs. r. 391–3–6–.03 (5) (c). The express
> purpose of the amendment was to "clarify the current language." *See*
> *Jackson v. Delk*, 257 Ga. 541, 543 (3), 361 S.E.2d 370 (1987)
> (considering "clarification" by a zoning board of its decision during
> the pendency of the appeal). It appears from the parties' supplemental
> briefing that the amendment to the regulation has been formally
> adopted by the Board and nothing remains to be done at the state
> level, but that the revised rule remains subject to EPA approval.

Id. at 131 n.13 (emphasis added). This footnote shows that the word

"unreasonable" was at one point considered for inclusion in the regulation itself

but, ultimately, was left out. See Ga. Comp. R. & Regs. 391–3–6–.03(5)(c).

Accordingly, the Court is not persuaded that the Rayonier decision requires that

Plaintiff plead "unreasonable" interference given the regulation's current form. As

a result, the Court declines to dismiss Plaintiff's Amended Complaint on this basis.

### 4. *Ongoing Violation under <u>Gwaltney</u>*

The Court will next briefly address Defendants' arguments under <u>Gwaltney</u>, 484 U.S. 49. Defendants note that in bringing a citizen suit under the CWA, a plaintiff must "allege a state of either continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the future"— to invoke a federal court's jurisdiction. <u>Atl. States Legal Found., Inc. v. Tyson Foods, Inc.</u>, 897 F.2d 1128, 1133 (11th Cir. 1990) (citing <u>Gwaltney</u>, 484 U.S. at 57). However, Defendants' argument is not that Plaintiff has not alleged *ongoing* activity; rather, Defendants argue that the CWA violation Plaintiff alleges is "not supported by law." [Doc. 34, p. 12]. And, Defendants contend, since there is no violation supported by law, there can be no *ongoing* violation (as is required by <u>Gwaltney</u>). But the Court has already determined, for the reasons discussed above, that Plaintiff has sufficiently pled a violation of the CWA. Accordingly, Defendants' arguments for dismissal on this ground fails.

### 5. *Plaintiff's Pre-Suit Notice*

The Court next turns to Defendants' contentions regarding the sufficiency of Plaintiff's pre-suit notice.[6] <u>See</u> [Doc. 34, pp. 22–25]. The CWA requires that a

---

[6] Defendants raise a question regarding which subsection of Rule 12(b) would apply to dismiss a plaintiff's case when that plaintiff has failed to provide adequate pre-suit notice. The parties do not advocate for the application of any particular rule, and as Defendants

citizen plaintiff provide notice of its claims before filing a complaint. Specifically, the CWA reads: "No action may be commenced . . . prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator [of the Environmental Protection Agency], (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation or order. . . ." 33 U.S.C. § 1365(b). The corresponding regulation further provides:

> Notice . . . shall include sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

40 C.F.R. § 135.3.

This notice requirement is "strictly construed to give the alleged violator the opportunity to correct the problem before a lawsuit is filed." Nat'l Parks & Conservation Ass'n Inc. v. Tenn. Valley Auth., 502 F.3d 1316, 1329 (11th Cir. 2007). Even so, the notice requirement "does not demand that a citizen plaintiff

---

point out—and the Court previously discussed in its Order regarding Plaintiff's Motion for Preliminary Injunction—courts dealing with this and similar issues have handled the question differently. In any case, irrespective of the rule that would apply to dismiss Plaintiff's case if its pre-suit notice had been insufficient, the Court finds that it was adequate for the reasons stated below.

'list every specific aspect or detail of every alleged violation.'" Johnson v. 3M, 563 F. Supp. 3d 1253, 1282 (N.D. Ga. 2021) (quoting Nat'l Parks & Conservation Ass'n, 502 F.3d at 1329), aff'd sub nom. Johnson v. 3M Co., 55 F.4th 1304 (11th Cir. 2022). Rather, the notice letter must simply provide enough information to allow the recipient to identify the allegedly offending activity and violated standards. Id. "In practical terms, the notice must be sufficiently specific to inform the alleged violator about what it is doing wrong, so that it will know what corrective actions will avert a lawsuit." Carney v. Gordon County, Georgia, No. CIVA 06CV36, 2006 WL 4347048, at *5 (N.D. Ga. Sept. 12, 2006) (quoting Atl. States Legal Found., Inc. v. Stroh Die Casting Co., 116 F.3d 814, 819 (7th Cir.1997)).

Here, Plaintiff sent a letter to Defendants regarding their alleged violations before filing suit (Plaintiff's "Notice Letter"). See [Doc. 29-1]. However, Defendants argue that the Notice Letter was not specific enough to meet the requirements of 40 C.F.R. § 135.3 and the CWA. [Doc. 34, p. 24]. Defendants explain that the Notice Letter "alleges discharges to a specific perennial tributary that runs through the property and into Intrenchment Creek." Id. However, Defendants argue, "in [Plaintiff's] amended complaint, [Plaintiff] expands [its] allegations to specifically target 'Parcel 15 051 01 002,' which was absent from the

Notice Letter." Id. Accordingly, because reference to this specific parcel number was missing from Plaintiff's Notice Letter, Defendants contend that Plaintiff did not provide sufficient detail regarding which area of Intrenchment Creek was allegedly being affected by Defendants' discharges. Id. at 25.

In response, Plaintiff explains that the parcel number was included in the Amended Complaint only to establish the standing of its members. [Doc. 35, pp. 13–14]. Plaintiff argues that the parcel number does not alter the nature of Defendants' alleged violations as described in the Notice Letter, and its descriptions were sufficient to notify Defendants of their offending conduct. Id. at 15–16. In support of its position, Plaintiff points to the following information it provided in its Notice Letter:

> The pre-suit notice letter included photographs showing the "tributary carrying sediment from the training center construction site into Intrenchment Creek." (Doc. 29-1, pp. 6-9). The notice letter alleged that stormwater "from the training center construction site interferes with the designated use of Intrenchment Creek by causing turbidity and sediment that harms fish and macroinvertebrates already stressed" by sediment pollution, thus causing a violation of water quality standards by interfering with Intrenchment Creek's capacity to support aquatic life. (Doc. 29-1, p. 6 citing 2007 and 2017 Total Maximum Daily Load Evaluations for Stream Segments in the Ocmulgee River Basin for Sediment). The notice letter stated that Part I.C.4 of the general permit "doesn't authorize stormwater discharges which violate Georgia's in-stream water quality standards" and that stormwater discharges from a construction site which "aren't authorized under the General Permit violate Section 301(a) of the

> Clean Water Act." (General Permit, Part I.C.4; 33 U.S.C. § 1311(a)).
> (Doc. 1-1, p. 5).

Id.

Upon review, the Court agrees that Plaintiff's Notice Letter included "sufficient information to permit [Defendants] to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, [and] the location of the alleged violation . . . ." 40 C.F.R. § 135.3; see [Doc. 29-1, pp. 5–9]. Even though "Parcel 15 051 01 002" was omitted from it, the Court is satisfied that Plaintiff's Notice Letter was "sufficiently specific to inform [Defendants] about what [they] were doing wrong." See Carney, 2006 WL 4347048, at *5–7 (finding that although the plaintiff's notice letter "could have been more carefully and precisely drawn," it was nonetheless sufficiently specific). Thus, the Court declines to dismiss Plaintiff's case on this basis.

### 6. *Collateral Attack*

Defendants next argue that Plaintiff's suit "is in reality an impermissible collateral attack on EPD's 2018 decision to issue the [General] Permit." [Doc. 34, p. 25]. Because the CWA does not contemplate challenges to the sufficiency of a state's NPDES permits, Defendants argue, this Court should dismiss the claim.

See 33 U.S.C. § 1365. However, as already discussed, the Court is persuaded that Part I.C.4. of the General Permit establishes an independent requirement of the General Permit, capable of violation separate from its other more substantive provisions. Accordingly, Plaintiff's suit alleges violation of an NPDES permit and, therefore, is a cognizable claim under the CWA's citizen suit provision—not a collateral attack on a prior agency decision. 33 U.S.C. § 1365(a); Parker, 386 F.3d at 1005.

7. **_Burford_ _Abstention_**

Finally, Defendants argue that this Court should abstain from hearing Plaintiff's CWA claim pursuant to Burford v. Sun Oil Co., 319 U.S. 315 (1943). The so-called Burford doctrine provides:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

New Orleans Pub. Serv., Inc. v. Council of City of New Orleans, 491 U.S. 350, 361 (1989) (internal quotation marks and citation omitted).

However, the CWA specifically confers jurisdiction upon federal courts to hear citizen suits like Plaintiff's. Because of this, other district courts have found

<u>Burford</u> abstention inappropriate in such cases.  <u>See, e.g.</u>, <u>Flint Riverkeeper, Inc. v.</u>

<u>S. Mills, Inc.</u>, 276 F. Supp. 3d 1359, 1369–70 (M.D. Ga. 2017) (collecting cases).

The Court is persuaded by the reasoning of those decisions and agrees that "to

abstain from exercising jurisdiction over Plaintiffs' claim 'would essentially

deprive them of the statutory right that Congress saw fit to confer upon them.'"  <u>Id.</u>

(quoting <u>Long Island Soundkeeper Fund, Inc. v. N.Y.C. Dep't of Env't Prot.</u>, 27 F.

Supp. 2d 380, 385 (E.D.N.Y. 1998)).  Accordingly, the Court declines to abstain

under <u>Burford</u>.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss [Doc. 34] is

**DENIED**.  Additionally, Local Rule 16.2 requires parties to submit a Joint

Preliminary Report and Discovery Plan.  "The completed form must be filed within

thirty days after the appearance of the first defendant by answer or motion or

within thirty days after a removed case is filed in this Court."  LR 16.2.

The parties are **HEREBY ORDERED** to file the Joint Preliminary Report

and Discovery Plan no later than September 20, 2024.  The parties are notified that

a failure to comply with this Order may result in sanctions, including dismissal.  In

the event a Joint Preliminary Report and Discovery Plan is not filed, the Clerk is

**DIRECTED** to submit the case at the expiration of the applicable time period.

**SO ORDERED** this 30th day of August, 2024.

_____
J. P. BOULEE
United States District Judge